Pennsylvania Human Relations Commission, Petitioner *v.* School District of Philadelphia, Respondent. Harry and Annemarie Gwynne et al., (Citizens Committee for the Preservation of Neighborhood Schools), Intervenors. Dr. and Mrs. Albert List, Jr., et al., Intervenors.

Argued December 1, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Roy Yaffe,* Assistant General Counsel, with him *Sanford Kahn,* General Counsel, for petitioner.

*Martin Horowitz,* Assistant Counsel, for respondent, School District.

*Lawrence I. Boonin,* for School Board member, Boonin.

*Stephen F. Freind,* with him *Freind & Willmann,* for intervenors, Harry and Anne Marie Gwynne, et al. and Dr. and Mrs. Albert List, Jr., et al.

*William H. Ewing,* with him *Goodman & Ewing,* for amicus curiae, Mt. Airy Neighbors, Inc.

OPINION BY JUDGE ROGERS, February 13, 1976:

Before us are petitions of the Pennsylvania Human Relations Commission for enforcement of its order upon the School District of Philadelphia that the latter submit a plan and timetable for the elimination of racial imbalance in the public schools of the City of Philadelphia.

The Commission's order, which amended an earlier order of the Commission affirmed by us in *Philadelphia School District v. Human Relations Commission,* 6 Pa. Commonwealth Ct. 281, 294 A.2d 410 (1972), reads as follows:

"AMENDED FINAL ORDER

"AND NOW, this 25th day of September, 1972, pursuant to the Opinion and Order of the Commonwealth Court of Pennsylvania in *The School District of Philadelphia v. Pennsylvania Human Relations Commission* (No. 524 Commonwealth Docket, 1971), dated August 17, 1972, and upon consideration of the foregoing Findings of Fact and Conclusions of Law and pursuant to Section 9 of the Pennsylvania Human Relations Act, the Pennsylvania Human Relations Commission

"Orders

"A. Respondent, The School District of Philadelphia, to develop and submit to the Pennsylvania Human Relations Commission by January 2, 1973, for approval by the Commission, a plan and timetable for implementation thereof that will eliminate racial imbalance[1] in its schools. Such plan shall conform to the 'Recommended Elements of a School Desegregation Plan,' dated May 15, 1968, attached hereto and made part hereof with the exception of paragraph four of said 'Recommended Elements.'

"B. That the plan and timetable for its implementation submitted shall accomplish the following:

1. Elimination of racial imbalance in all vocational-technical schools by the beginning of the school year 1973-74.

2. Elimination of racial imbalance in all senior high schools by the beginning of the school year 1973-74.

3. Elimination of racial imbalance in all junior high schools by the beginning of the school year 1973-74.

4. Elimination of racial imbalance in all middle schools by the beginning of the school year 1973-74.

5. Elimination of racial imbalance in all elementary schools in and by the following steps:

    (a) By the beginning of the school year 1973-74, reducing by at least one-third the number of elementary schools with racial imbalance.

---

"1. Racially imbalanced schools are those having a percent Negro enrollment less than or more than 30% of the percent Negro pupils among the buildings of the same grade span.

    (b) By the beginning of the school year 1974-75, reducing by at least one-half the remaining number of elementary schools with racial imbalance.

    (c) By the beginning of the school year 1975-76, eliminating any remaining racial imbalance in elementary schools.

"C. That the plan and timetable for its implementation submitted shall:

    1. Include beginning and completion dates for each desegregation step, together with the projected desegregation results of each step in terms of the number and identity of Respondent's schools and the number of the Respondent's pupils changed from a status of racial imbalance to racial balance.

    2. Avoid transportation of pupils for lengths of time or distance that risk their health or significantly impinge on their education process. If the results of this stipulation is that racial imbalance will not be corrected in all schools, this plan must include justification acceptable to the Commission for this modification.

    3. Not place an undue share of the participation in reassignment or transportation on one racial group.

"D. That any decentralization plan adopted or implemented by Respondent be consistent with this Amended Final Order.

"E. That Respondent shall forthwith cease and desist from opening any new school without a racially-balanced pupil enrollment.

"F. That Respondent in applying for approval of the Pennsylvania Department of Education of any steps in school building projects shall provide the

Commission with the following data concerning the facility:

1. The location of the building site.
2. Pupil capacity.
3. Attendance area boundaries.
4. Projected enrollment by race.

"G. That Respondent report to the Commission as follows:

1. By February 1 of each year, for as long as the Commission shall require it to comply with this Order, the pupil enrollment by race of each school building in Respondent's district, on report forms to be provided by the Commission.
2. By June 1 and December 1 of each year, for as long as the Commission shall require it to comply with this Order, a progress status regarding its curricular desegregation programs.

"H. That the Pennsylvania Human Relations Commission shall retain jurisdiction in this matter and reserves the right to amend this Amended Final Order from time to time to ensure that the public school enrollment within The School District of Philadelphia will continue to remain racially-balanced."

As may be supposed, the history of the efforts of the Pennsylvania Human Relations Commission to require the School District of Philadelphia to submit a plan and timetable for curing racial imbalance, and the efforts of the District, faced with enormous demographical, geographical, financial, social and political problems, to respond, is long. It begins with our Supreme Court's decision in *Pennsylvania Human Relations Commission v. Chester School District*, 427 Pa. 157, 233 A.2d 290 (1967), that the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S.§951 et seq. proscribed de facto segregation of black students in the public schools of Pennsylvania, and that the Act em-

powers the Commission to order school districts to cure such conditions. The Commission and the Pennsylvania Department of Public Instruction (now the Department of Education) on May 15, 1968 jointly prepared and thereafter used a document called "Recommended Elements of a School Desegregation Plan" referred to in its Amended Final Order to the District. *See Pennsylvania Human Relations Commission v. Norristown Area School District*, 20 Pa. Commonwealth Ct. 555, 342 A.2d 464 (1975). The "Recommended Elements" are as follows:

"1. Does the desegregation plan indicate the projected racial composition of each elementary and and secondary school attendance area and the racial composition of the total staff of each building as of the completion dates of each step?

"2. Does the desegregation plan identify the location of proposed school building construction sites?

"3. How nearly does the desegregation plan bring the per cent Negro pupils in each building to within 30% of the per cent Negro pupils among the buildings of the same grade span?

"4. Does the desegregation plan include procedures to affirmatively and effectively recruit and assign an integrated staff at all levels for all schools?

"5. Does the desegregation plan correct any untoward concentrations of professional or non-professional Negro staff in any buildings?

"6. Does the desegregation plan equally match the services of its professional staff and program with the educational needs of each school building?

"7. Does the desegregation plan include plans for in-service training of staff to meet the needs and problems incident to the implementation of desegregation plans?

"8. Does the desegregation plan include steps to include intergroup education programming and the inclusion of the contributions of Negroes and

other racial and ethnic groups in the history courses about Pennsylvania and the United States?

"9. Does the desegregation plan include a timetable indicating deadline dates by which each step will be completed? Are these dates as early as possible?

"10. Does the desegegration plan indicate involvement of the community in its development and implementation?

"11. Is the desegregation plan consistent with the Long Range Developmental Plan submitted to the Department of Public Instruction?"

In the year 1968 the Commission and the School District commenced discussions of what should and could be done in the Philadelphia District. The District filed a plan in June of 1969 which the Commission disapproved. Neither this plan nor the Commission's reasons for disapproving it are in the record. The Commission ultimately conducted hearings and issued the order requiring the submission of a further plan and timetable, which order was the subject of our deliberations in *Philadelphia School District v. Human Relations Commission, supra.* The Amended Final Order of September 25, 1972 followed.

The District, which did not appeal our decision in *Philadelphia School District v. Pennsylvania Human Relations Commission, supra,*[1] failed to submit a plan, and on August 6, 1973 the commission filed its first petition for

---

1. Other school districts which were parties to that litigation did appeal and our orders were affirmed in *Uniontown School District v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 313 A.2d 156 (1973). The Supreme Court held that Recommended Element number 3 requiring that desegregation plans should bring the percent of black pupils in each building to within thirty percent of the percent of black students in buildings of the same grade span was within the power of the Commission to enact.

enforcement of the Amended Final Order. The District filed an answer, the Commission filed a reply, we conducted an evidentiary hearing and on November 14, 1973, by Judge WILKINSON, ordered the District to submit a plan and timetable for implementation to the Commission on or before February 15, 1974. On that date the District filed a plan proposing in immediate future the busing of students from seven predominantly black schools and one predominantly white school to six other schools, the possibility of other such operations in the future and other measures, including the pairing of a "significant number of adjacent schools . . . which have a potential for pairing." There is evidence in the record that the number of schools which the District thought capable of being paired might be as low as fifteen and as high as forty. The Commission disapproved this plan and on April 2, 1974 filed a second petition for enforcement, requesting, *inter alia*, that this Court appoint a master. We conducted further hearings and on June 2, 1974 appointed the Honorable David H. Kurtzman, formerly Secretary of Public Instruction of Pennsylvania, as an expert to review the District's plan of February 15, 1974, and to report his recommendations on or before September 1, 1974. On August 29, 1974, Dr. Kurtzman filed his report, recommending that the District should be required as a first step to reassign and bus pupils in a designated portion of the City and to use this experience as a model for other areas in the future. Judge WILKINSON conducted a further hearing on September 24, 1974 at which both the Commission and the District presented evidence in opposition to Dr. Kurtzman's proposal.

On October 1, 1974, Judge WILKINSON ordered both the Commission and the District to prepare final definitive plans and to submit them to the Court on or before January 31, 1975. On the request of both parties this time was extended until July 7, 1975, and within that time both parties filed plans which we will describe later in this opinion.

We conducted four days of hearing in August, 1975, at which each the Commission and the School District explained its plan and produced objections to the other's proposal. Interested members of the public were also heard, most of whom expressed opposition to the Commission's plan. Before the hearings we permitted intervention of the members of a group of persons calling themselves Citizens Committee for Neighborhood Schools and at the time of hearing we permitted the intervention of a number of other interested individuals.

In December 1975, the full court heard the argument of counsel for the Commission, the District and the two groups of individuals.

The facts we find to be established by the record, which, for the convenience of counsel in their review of this opinion we give seriatim, are as follows:

1. The School District of Philadelphia is coterminous with the City limits of Philadelphia. The City has an area of 129 square miles. The distance from the extreme northeastern boundary line to the extreme southwestern is about 24 miles. The City extends inland from the west bank of the Delaware River for distances up to 10 miles.

2. During the 1974-1975 school year, according to latest complete statistics in the record, 266,500 persons were enrolled in the public schools. The Roman Catholic parochial school system educates an additional approximately 100,000 students, most of whom are white.

3. Of the 266,500 students of the District, 164,558, or 61.7 percent, are black and 88,480, or 33.2 percent, are white. The balance, 5.1 percent, are the minorities for which the District keeps records—American Indian, Oriental and Spanish Surnamed.

4. The categories of public schools are Senior and Vocational High Schools; Junior High Schools and Middle Schools; Elementary Schools and Special Schools.

5. The Senior High Schools which accommodate 61,373 students are 59.4 percent black and 37.4 percent

white. The Vocational Technical High Schools which have 5,786 students are 67.1 percent black and 27.8 percent white. The Junior High School students number 35,869, of which 70.9 percent are black and 22.5 percent are white. The Middle Schools with 18,046 students are 63 percent black and 35.8 percent white. The school population of the Elementary Schools is 141,598, of which 59.9 percent are black and 34.1 percent are white. The Special Schools which have 3,828 pupils are 68.2 percent black and 26.3 percent white.

6. The name Junior High School is given to schools generally accommodating students from grade 7 through 9. The term Middle School is applied to schools accommodating students from grade 5 through 8 or 9. High Schools generally conduct classes from the 9th to the 12th grade. There is great variation in the grade structures in particular Elementary Schools. It may be from Kindergarten to 8, Kindergarten to 7, Kindergarten to 6, Kindergarten to 5, Kindergarten to 4, or Kindergarten to 1. One school, Lamberton, teaches students from Kindergarten through the 11th grade.

7. There appear to be 30 High Schools, four Vocational Technical High Schools, 27 Junior High Schools, 17 Middle Schools, and 198 Elementary Schools, and 18 Special Schools. There are, therefore, 294 schools in the system.

8. The Philadelphia School District is divided into eight numbered administrative districts. The District is further divided into 21 so-called School Planning Areas, bearing designation by letters from A to U. The eight administrative districts and the 21 School Planning Areas are shown by this map.

# 21 SCHOOL PLANNING AREAS (S.P.A.)
# SCHOOL DISTRICT OF PHILADELPHIA

LEGEND

PHILADELPHIA COUNTY BOUNDARY — · · —

SCHOOL PLANNING AREAS (SPA) BOUNDARIES

ADMINISTRATIVE DISTRICTS BOUNDARIES

SCHOOL DISTRICT OF PHILADELPHIA

9. Administrative District 8, popularly referred to as the Northeast, is seven miles long and between five and six miles wide. There are 39,812 students in Administrative District 8, 95.5 percent of which are white and 3.5 percent are black. In Administrative District 1, located at the extreme Southwestern corner of the school district, there are 41,488 students, of whom 90.2 percent are black and 9.6 percent are white. In District 4, adjoining District 1 on the North, there are 37,987 students, of which 95.5 percent are black and four percent are white. In District 2, adjoining District 1 on the East, there are 28,248 students, 83.3 percent black and 10.2 percent white. Stated in general terms, the Northeastern section of the City is overwhelmingly white and the Southwestern part is overwhelmingly black.

10. The proportions of black and white students in the other administrative districts are as follows:

District 3, with 18,372 students, 54.3 percent black, 38.4 percent white.

District 5, with 29,457 students, 41.3 percent black, 32 percent white, and 26.5 percent Spanish surname.

District 6, with 40,855 students, 80.1 percent black, 18.8 percent white; and

District 7, 30,321 students, 33.5 percent black, seven percent Spanish surname, and 58.7 percent white.

11. The total number of students and the percentage of black and white students in the twenty-one School Planning Areas are as follows:

| Area | Total Students | Percentage Black |
|---|---|---|
| A | 15,024 | 98.3 |
| B | 11,119 | 87.9 |
| C | 11,687 | 98.1 |
| D | 17,012 | 79.3 |
| E | 6,090 | 87. |
| F | 27,012 | 91.2 |
| G | 6,938 | 32.7 |
| H | 21,104 | 99. |

| Area | Total Students | Percentage Black |
|------|---------------|------------------|
| I | 14,925 | 92.1 |
| J | 1,759 | 45.8 |
| K | 11,239 | 85.2 |
| L | 12,403 | 47.1 |
| M | 13,952 | 37.3 |
| N | 14,434 | 72.3 |
| O | 13,635 | 47.1 |
| P | 12,318 | 0.9 |
| Q | 6,883 | 1.4 |
| R | 8,760 | 5.8 |
| S | 9,449 | 3.3 |
| T | 12,473 | 14.4 |
| U | 11,664 | 22.5 |

12. The percentage of black pupils in grades 1 through 9, excluding Kindergarten and exceptional pupils, is 63.3. The percentage of black pupils in grades 10 through 12 was 60.6. Applying the Commission's 30 percent standard of Recommended Element No. 3 to those percentages, we find that any elementary, middle or junior high school falling within a range of 82.3 to 44.3 percent black, and any senior high school falling within a range of 78.8 to 42.4 percent black would be "desegregated" by the Commission's guidelines.

13. Of the total of 242 elementary, middle and junior high schools, 106 have more than 90 percent black pupils. An additional six of those schools have more than 82.3 percent of black pupils.

14. Fifty elementary, junior and middle high schools have more than 90 percent white pupils. An additional 25 elementary, junior and middle schools have more than 60 percent white pupils.

15. Of the 34 senior and vocational technical high schools, eleven are more than 90 percent black and an additional two have more than 78.8 percent of black pupils.

16. Three high schools, all located in the Northeast, have more than 90 percent white pupils.

17. Including special schools, of which 11 of 18 appear to be in a state of racial imbalance, at least 211 of the District's 294 schools do not conform with the Commission's Recommended Element No. 3.

18. The District is and has been in a condition of financial stringency, if not distress. With budgets near $500,000,000, it had a deficit of $7,500,000 for 1974-75. It will have a deficit of about $25,000,000 for 1975-76 and projects a deficit of about $108,500,000 for 1976-77. The Board being appointed, the District must depend for local financing on City Council.

19. There is no direct evidence in this case that the District has by arranging attendance areas or otherwise created or fostered racial imbalance in its schools. While there is evidence that some efforts have been made to achieve mobility of races in the District by the establishment of magnet schools and optional programs, there is nothing in the record establishing that the District has transported pupils for purposes of improving the conditions of racial imbalance. The District now buses about 16,000 public school students for other reasons.

20. The District's staff is integrated.

21. There are juvenile gangs in Philadelphia which are hostile to outsiders venturing into their neighborhoods. Pupils transported to such neighborhoods could be the objects of gang hostility.

The Commission would have us take a stern view of the District's lack of progress toward curing racial imbalance since 1968. While there has doubtless been intransigeance on the part of the District, the Commission must share the blame for the unfruitfulness of the discussions between the parties and of this litigation. The Commission has always insisted that any plan submitted by the District must bring all of the Philadelphia schools within its Recommended Element No. 3. The Final Amended Order which it here seeks to enforce states this requirement as an imperative. The District's efforts to comply with the Commission's Orders were undoubtedly

inhibited by what it believed to be the impossibility of preparing a plan that could receive approval. The wisdom of Judge WILKINSON'S order that the Commission itself suggest a plan is demonstrated by the fact that the Commission now concedes that 11 schools, with about 15,000 students almost all white, in School Planning Areas P and Q, should not, because of travel time, be integrated and that 23 additional schools, 18 of which are black and five white, in other School Planning Areas must remain segregated for the same reason.[1] While the number of 34 schools is small compared to the 294 schools in the District, it is not small compared to the proposal of the Commission's plan that 39,483 elementary pupils be reassigned and that 33,853 elementary pupils and 19,806 middle and junior high school pupils be transported.

We next comment, as our finding numbered 19 implies, that we are unable to conclude that the District has deliberately created or preserved a dual school system so as to give the matter constitutional proportions. No parents of pupils have joined the Commission as complainants. Three persons representing civil rights groups called for greater integration of the city schools. Two of these witnesses entertained reservations about the Commission's plan and one had not studied the plan.

We come finally to descriptions and consideration of the plans before us, two of which we ordered and four of which have been volunteered:

## SCHOOL DISTRICT PLAN

We can be very brief concerning the School District's proposal. It says (it now appears correctly) that full compliance with this Court's direction that its plan comply with the Commission's Recommended Element No. 3 is a physical impossibility. It records its financial condition of large deficits and the refusal of financial aid by

---

1. Our numbers here and elsewhere in this opinion may prove not to be exact; they are the best we can do with the welter of sometimes unreconcilable data in the record.

the Commonwealth as rendering compliance with any order requiring the expenditure of "millions of dollars" impossible. It proposes, if the Commonwealth provides complete financing, the creation of a Metropolitan School District which would include Philadelphia and ten adjacent school districts in Montgomery and Delaware Counties. These joined districts would provide about 60,000 white pupils to be integrated with the predominantly black pupils in Administrative Districts 1, 4 and 6, and would make it possible to achieve an almost even number of black and white pupils in adjacent areas of Philadelphia.

The District, of course, concedes that its proposal, which to our knowledge has been a subject of public discussion but without action for at least ten years, is beyond the District's power to implement and the Commission's power to order. It is just as certainly beyond our power to compel and must be rejected. State policy seems thus far to be that Philadelphia should single-handedly struggle with the State's statute mandating the integration of the public schools, whatever the difficulties.

## VOLUNTEERED PLANS

Tobyann Boonin, a member of the Philadelphia School Board, has submitted a proposal for Programmatic Desegregation Academies, each specializing in a particular discipline—art, english, foreign languages, mathematics, music, physical and health education, science and social studies. It is proposed that pupils will be transported to these centers, which would be desegregated, on each school day, thus providing every pupil one day each week in an integrated school environment.

School Board member Augustus Baxter also advocates a Metropolitan District. He has additionally proposed as aids to integration within Philadelphia's boundaries the closing of nonfire-resistant schools, the pairing of schools, the desegregation of high schools, new Parkway Program clusters, new intensive learning programs, busing, closing

underutilized schools, and the creation of two new junior high schools. These efforts it is claimed would desegregate 130 or 44.2 percent of the District's schools. Mr. Baxter also espouses the academy proposal suggested by Mrs. Boonin as a further aid to integration.

The Citizens Committee for the Preservation of Neighborhood Schools representing some intervenors proposes a program of voluntary busing and an increase in the number of magnet and trade schools located at various places in the city to which pupils would be attracted, presumably in integrated numbers.

Other individual intervenors have proposed the formation of a 158 person committee of parents, students, representatives of various institutions and intervenors which, under the supervision of this court, would first develop guidelines and later formulate a plan for integration.

Each of these plans appears to have some merit. Directors Boonin and Baxter's proposals have the additional quality of suggesting immediate action on the part of the Board.

None of these volunteered plans have been approved by the District Board of Education and none have been submitted to the Pennsylvania Human Relations Commission. It is clear from the actions of the Commission with respect to the District's plan filed in 1974 and to Dr. Kurtzman's proposal that it would not consider these measures as compliance with the law, and we are unwilling as yet to substitute our judgment for the Commission's.

We commit these plans to the Board of Education and the Commission for their consideration.

## THE COMMISSION'S PLAN

The Commission engaged the services of an expert in school integration, Dr. Gordon Foster. The Commission instructed Dr. Foster to propose a means whereby the schools might be integrated as its guidelines provide

without requiring any child to be transported to school one way for more than forty-five minutes. So far as this record shows, the Commission had never suggested to the District that it might employ such a limitation on travel in producing plans in response to the Commission's order.

Dr. Foster divided the District into ten clusters as follows:

| | | |
|---|---|---|
| Cluster 1 | SPAs | A and G |
| Cluster 2 | SPA | B |
| Cluster 3 | SPAs | C, J, K, O |
| Cluster 4 | SPA | D |
| Cluster 5 | SPAs | E, F, L and an eastern portion of T |
| Cluster 6 | SPAs | H and portions of S and T |
| Cluster 7 | SPAs | I, U |
| Cluster 8 | SPAs | M and a portion of T |
| Cluster 9 | SPAs | N, R and portions of Q and S |
| Cluster 10 | SPA | P and a portion of Q |

Eleven schools in Cluster 10, being all those in SPA P and all but one in SPA Q are unaffected by Dr. Foster's proposal and remain almost entirely white. The plan, as we have earlier noted, proposes for the balance of the District the reassignment of 39,483 elementary pupils and the busing of 33,853 elementary and 19,806 junior and middle school students.

Kindergarten students, students attending nine city-wide schools and exceptional students requiring special physical facilities are not reassigned. No busing is proposed for high school pupils, all of whom would use public transportation.

The schools within Clusters are grouped, and pupils within groups are then assigned together to middle and junior high schools and then to high schools in so-called feeder patterns.

Dr. Foster attempted to eliminate as many of the schools as possible from the category of what he calls

racially identifiable. He defines a racially identifiable school as any which offends the Commission's Recommended Element No. 3—that is, as any elementary or junior high or middle school having less than 82.3 percent of black students or more than 44.3 percent of white students, and any senior high school having more than 78.8 percent of black students or more than 42.4 percent of white students. He observes, using this definition, that his plan reduces the number of racially identifiable schools from 216 (of which 124 are black) at present to 34. In fact, however, the percentage of black students in many of the presently so-called racially identifiable black schools is reduced very little. There are presently about 136 schools with 70 to 100 percent black pupils and 142 schools with 60 to 100 percent black pupils. After implementation of Dr. Foster's proposal there would still remain 125 schools with 70 to about 83 percent black and 168 schools with 60 to about 83 percent black students.

The District contends that a school with as many as three-fourths black pupils remains racially identifiably black. It says, with some justice, that Dr. Foster's plan requires vast movement of pupils at great cost in money and inconvenience with little practical effect on the black schools claimed to have been integrated.

Dr. Foster testified that in his opinion the annual cost of transporting 53,659 pupils as he proposes by contracting with others would be about $4,000,000. If the District chose to operate its own system he estimates that an initial outlay of $5,000,000 for equipment would be required. The District's director of transportation says that the annual cost for contracted services would be $8,200,000, and that the initial cost if the District should purchase buses using staggered starts would be $17,800,000. If staggered starts were not approved, and there are good reasons for not employing this practice, the initial cost would be $35,000,000. The District presently transports about 12,000 nonpublic school pupils,

16,000 public school pupils and provides public transportation costs for an additional 12,000, all at an approximate annual cost of $7,000,000.

Dr. Foster concedes that, because of time constraints, his plan is merely a pupil reassignment proposal without regard to community involvement, educational benefit, and future building concerns, all matters required by the Commission's Recommended Elements to be considered in any plan. Further, due again to time constraints and in addition to the form in which some of the data was supplied, Dr. Foster was compelled to calculate travel time of pupils only from the school of their enrollment to that to which he proposes that they should be transported. Since the District now buses about 16,000 public school pupils either because of the distance from their residence to school or for overcrowding, it is probable that many of the pupils Dr. Foster proposes transporting will be required to spend more than the 45 minutes the Commission agrees should be the longest time any pupil should be asked to use in school travel.

We conclude that we should not respond to the prayers of the Commission's petitions for enforcement by directing the District to implement Dr. Foster's proposal because it is without educational content or community contribution and, in our judgment, requires more to be done than its practical effect on the 115 schools having 90 percent or more black students justifies.

On the other hand, there is evidence in this record which compels the conclusion that there is racial imbalance in the Philadelphia schools which can be corrected. The School Planning Areas, as we understand them, were intended as divisions of this huge district convenient for the study and provision of physical facilities. The following information culled from Dr. Foster's report could easily lead to the conclusion that planning for racial integration was either not included in, or given little attention, when the Board considered the needs of its School Planning Areas.

SCHOOL PLANNING AREA D
1974-75 ENROLLMENTS

| Schools | Grade Organiz. | B | SS | W & O | Tot. | % B | Design Capac. | Use Capac. |
|---|---|---|---|---|---|---|---|---|
| Catherine | K-5, Ex | 231 | 1 | 461 | 963 | 33.3 | 900 | 851 |
| Comegys | K-6, Ex | 884 | 0 | 8 | 892 | 99.1 | 880 | 848 |
| Harrington | K-4, Ex | 1094 | 1 | 7 | 1102 | 99.3 | 999 | 967 |
| Longstreth | K-4, Ex | 1143 | 2 | 19 | 1164 | 98.2 | 1079 | 1020 |
| Mitchell | K-5, Ex | 1017 | 1 | 34 | 1052 | 96.7 | 1112 | 1063 |
| Morton | K-5 | 461 | 0 | 422 | 883 | 52.2 | 877 | 861 |
| Patterson | K-4, Ex | 156 | 0 | 656 | 812 | 19.2 | 987 | 953 |
| Wilson | K-7, Ex | 543 | 0 | 3 | 546 | 99.5 | 648 | 599 |
| Wolf | K-4, Ex | 140 | 0 | 117 | 257 | 54.4 | 618 | 586 |
| Elementary Totals | | 5669 | 5 | 1727 | 7401 | 76.6 | 8100 | 7748 |
| Pepper M.S. | 5-8 | 517 | 3 | 457 | 977 | 52.9 | 1680 | 1680 |
| Shaw JHS | 7-9 | 1267 | 0 | 15 | 1282 | 98.8 | 1569 | 1528 |
| Tilden M.S. | 6-8 | 984 | 0 | 277 | 1261 | 78.0 | 1397 | 1356 |
| Turner M.S.* | 6-8 | 1656 | 1 | 5 | 1662 | 99.6 | 1571 | 1503 |
| Bartram H.S. | 9-12 | 3405 | 4 | 1020 | 4429 | 76.9 | 3246 | 3165 |
| Secondary Totals | | 7829 | 8 | 1774 | 9611 | 81.5 | 9463 | 9232 |
| SPA D Totals | | 13498 | 13 | 3501 | 17012 | 79.3 | 17563 | 16980 |

## SCHOOL PLANNING AREA G
### 1974-75 ENROLLMENTS

| Schools | Grade Organiz. | B | SS | W & O | Tot. | % B | Design Capac. | Use Capac. |
|---|---|---|---|---|---|---|---|---|
| Cook-Wissahickon | K-6, Ex | 148 | 2 | 549 | 699 | 21.2 | 786 | 721 |
| Dobson | K-8, Ex | 104 | 8 | 329 | 441 | 23.6 | 494 | 462 |
| East Falls | K-6, Ex | 525 | 20 | 1 | 546 | 96.2 | 524 | 508 |
| Levering | K-8 | 118 | 1 | 667 | 786 | 15.0 | 796 | 796 |
| Mifflin | K-8, Ex | 649 | 3 | 118 | 770 | 84.3 | 792 | 776 |
| Shawmont | K-8, Ex | 81 | 6 | 797 | 884 | 9.2 | 935 | 919 |
| Elementary Totals | | 1625 | 40 | 2461 | 4126 | 39.4 | 4327 | 4182 |
| Roxborough H.S. | 9-12 | 494 | 23 | 1803 | 2320 | 21.3 | 2049 | 2022 |
| Saul Voc-Tech | 9-12 | 151 | 6 | 331 | 492 | 30.7 | 481 | 481 |
| Secondary Totals | | 645 | 29 | 2134 | 2812 | 22.9 | 2530 | 2503 |
| SPA G Totals | | 2270 | 69 | 4595 | 6938 | 32.7 | 6857 | 6685 |

334

## SCHOOL PLANNING AREA I
### 1974-75 ENROLLMENTS

| Schools | Grade Organiz. | B | SS | W & O | Tot. | % B | Design Capac. | Use Capac. |
|---|---|---|---|---|---|---|---|---|
| Bache | K-6, Ex | 289 | 35 | 33 | 357 | 81.0 | 738 | 706 |
| Blaine | K-6, Ex | 652 | 0 | 2 | 654 | 99.7 | 1136 | 1055 |
| Carver | K-7, Ex | 895 | 2 | 1 | 898 | 99.7 | 1267 | 1235 |
| Darrah | K-7, Ex | 398 | 47 | 1 | 446 | 89.2 | 530 | 498 |
| Dick | K-6, Ex | 956 | 0 | 1 | 957 | 99.9 | 1237 | 1026 |
| Douglass, F. | K-6, Ex | 835 | 6 | 5 | 846 | 98.7 | 1475 | 1297 |
| Duckrey | K-6, Ex | 793 | 1 | 0 | 794 | 99.9 | 912 | 896 |
| Gideon | K-7, Ex | 783 | 1 | 0 | 784 | 99.9 | 1095 | 1063 |
| Kelley, W. | K-7, Ex | 850 | 1 | 0 | 851 | 99.9 | 999 | 934 |
| Meade | K-6, Ex | 1215 | 3 | 0 | 1218 | 99.8 | 1379 | 1314 |
| Morris | K-6, Ex | 846 | 11 | 28 | 885 | 95.6 | 1183 | 1152 |
| Reynolds | K-7, Ex | 890 | 3 | 0 | 893 | 99.7 | 1118 | 1086 |
| Sartain | K-7, Ex | 447 | 0 | 0 | 447 | 100.0 | 588 | 572 |
| Stokely | K-6 | 274 | 0 | 0 | 274 | 100.0 | 410 | 410 |
| Waring | K-4, Ex | 57 | 508 | 27 | 592 | 9.6 | 672 | 656 |
| Elementary Totals | | 10180 | 618 | 98 | 10896 | 93.4 | 14739 | 13900 |
| Masterman M.S. | 5-9 | 548 | 9 | 368 | 925 | 59.2 | 882 | 882 |
| Vaux J.H.S. | 7-9 | 1526 | 16 | 3 | 1545 | 98.8 | 1600 | 1546 |
| Franklin H.S. | 10-12 | 1492 | 63 | 4 | 1559 | 95.7 | 2029 | 1961 |
| Secondary Totals | | 3566 | 88 | 375 | 4029 | 88.5 | 4511 | 4389 |
| SPA I Totals | | 13746 | 706 | 473 | 14925 | 92.1 | 19250 | 18289 |

## SPA L
### 1974-75 ENROLLMENTS

| Schools | Grade Organiz. | B | SS | W & O | Tot. | % B | Design Capac. | Use Capac. |
|---|---|---|---|---|---|---|---|---|
| Barton | K-8, Ex | 52 | 30 | 909 | 991 | 5.2 | 968 | 919 |
| Birney | K-6, Ex | 677 | 150 | 382 | 1209 | 56.0 | 1118 | 1069 |
| Ellwood | K-6 | 302 | 2 | 152 | 456 | 66.2 | 584 | 568 |
| Feltonville | K-6 | 0 | 7 | 286 | 293 | 0.0 | 351 | 351 |
| Finletter | K-8 | 64 | 8 | 720 | 792 | 8.1 | 964 | 964 |
| Howe | K-6, Ex | 614 | 20 | 29 | 663 | 92.6 | 673 | 657 |
| Lowell | K-8 | 37 | 13 | 545 | 595 | 6.2 | 662 | 662 |
| Morrison | K-8, Ex | 5 | 22 | 637 | 664 | 0.8 | 637 | 651 |
| Olney | K-8 | 23 | 5 | 534 | 562 | 4.1 | 614 | 614 |
| Elementary Totals | | 1774 | 257 | 4194 | 6225 | 28.5 | 6571 | 6455 |
| Cooke J.H.S. | 7-9 | 1277 | 156 | 134 | 1567 | 81.5 | 1200 | 1146 |
| Olney H.S. | 9-12 | 2797 | 305 | 1509 | 4611 | 60.7 | 3548 | 3507 |
| Secondary Totals | | 4074 | 461 | 1643 | 6178 | 65.9 | 4748 | 4653 |
| SPA L Totals | | 5848 | 718 | 5837 | 12403 | 47.1 | 11319 | 11108 |

SPA M
1974-75 ENROLLMENTS

| Schools | Grade Organiz. | B | SS | W & O | Tot. | % B | Design Capac. | Use Capac. |
|---|---|---|---|---|---|---|---|---|
| Bethune | K-6, Ex | 1169 | 103 | 7 | 1279 | 91.4 | 1250 | 1218 |
| Clymer | K-6, Ex | 809 | 22 | 7 | 838 | 96.5 | 1059 | 1010 |
| Cramp | K-6, Ex | 29 | 213 | 619 | 861 | 3.4 | 930 | 914 |
| Elkin | K-6, Ex | 1 | 16 | 914 | 931 | 0.1 | 953 | 921 |
| Fairhill | K-5, Ex | 285 | 357 | 12 | 654 | 43.6 | 756 | 707 |
| Hopkinson | K-8 | 63 | 25 | 745 | 833 | 7.6 | 905 | 905 |
| McClure | K-6, Ex | 296 | 311 | 332 | 939 | 31.5 | 934 | 756 |
| Potter-Thomas | K-4, Ex | 347 | 665 | 46 | 1058 | 32.8 | 988 | 972 |
| Sheppard | K-6, Ex | 33 | 303 | 301 | 637 | 5.2 | 559 | 543 |
| Sheridan | K-6, Ex | 1 | 3 | 573 | 577 | 0.2 | 728 | 712 |
| Taylor | K-8, Ex | 192 | 458 | 185 | 835 | 23.0 | 613 | 597 |
| Thomas | 5-6 | 122 | 254 | 15 | 391 | 31.2 | (In Potter-Thomas) | |
| Elementary Totals | | 3347 | 2730 | 3756 | 9833 | 34.0 | 9675 | 9255 |
| Stetson JHS | 7-9 | 650 | 613 | 988 | 2251 | 28.9 | 1373 | 1359 |
| Edison H.S. | 10-12 | 1201 | 497 | 170 | 1868 | 64.3 | 2105 | 2010 |
| Secondary Totals | | 1851 | 1110 | 1158 | 4119 | 44.9 | 3478 | 3369 |
| SPA M Totals | | 5198 | 3840 | 4914 | 13952 | 37.3 | 13153 | 12624 |

School Planning Areas C, J, K and O are contiguous areas in South Philadelphia. As the following data shows, SPA C and K are

predominently black, SPA J (having comparatively few pupils) is predominently white, and SPA O has about an even proportion of black and white pupils.

SPA C
1974-75 ENROLLMENTS

| Schools | Grade Organiz. | B | SS | W & O | Tot. | % B | Design Capac. | Use Capac. |
|---|---|---|---|---|---|---|---|---|
| Anderson | K-5, Ex | 918 | 1 | 0 | 919 | 99.9 | 970 | 954 |
| Bryant | K-6, Ex | 1080 | 0 | 0 | 1080 | 100.0 | 1232 | 1200 |
| Hamilton | K-8, Ex | 1030 | 2 | 11 | 1043 | 98.8 | 994 | 994 |
| Harrity | K-5 | 745 | 0 | 0 | 745 | 100.0 | 994 | 994 |
| Holmes, O.W. | K-6, Ex | 673 | 3 | 4 | 680 | 99.0 | 827 | 714 |
| Huey | K-6, Ex | 1315 | 0 | 1 | 1316 | 99.9 | 1237 | 1205 |
| Lea | K-8 | 1123 | 3 | 181 | 1307 | 85.9 | 1237 | 1237 |
| Elementary Totals | | 6884 | 9 | 197 | 7090 | 97.1 | 7491 | 7298 |
| Sayre JHS | 7-9 | 1907 | 0 | 0 | 1907 | 100.0 | 1704 | 1677 |
| W. Phila. HS | 9-12 | 2684 | 3 | 3 | 2690 | 99.8 | 2870 | 2789 |
| Secondary Totals | | 4581 | 3 | 3 | 4597 | 99.9 | 4574 | 4466 |
| SPA C Totals | | 11465 | 12 | 200 | 11687 | 98.1 | 12065 | 11764 |

## SPA J
## 1974-75 ENROLLMENTS

| Schools | Grade Organiz. | B | SS | W & O | Tot. | % B | Design Capac. | Use Capac. |
|---|---|---|---|---|---|---|---|---|
| Durham | K-7 | 134 | 0 | 95 | 229 | 58.5 | 475 | 297 |
| Greenfield | K-8, Ex | 409 | 8 | 400 | 817 | 50.1 | 870 | 854 |
| McCall | K-8, Ex | 263 | 31 | 419 | 713 | 36.9 | 738 | 666 |
| Elementary Totals | | 806 | 39 | 914 | 1759 | 45.8 | 2083 | 1817 |

## SPA K
### 1974-75 ENROLLMENTS

| Schools | Grade Organiz. | B | SS | W & O | Tot. | % B | Design Capac. | Use Capac. |
|---|---|---|---|---|---|---|---|---|
| Alcorn | K-6, Ex | 748 | 5 | 3 | 756 | 98.9 | 816 | 784 |
| Arthur | K-6, Ex | 479 | 0 | 2 | 481 | 99.6 | 618 | 586 |
| Benson | K-6, Ex | 263 | 0 | 2 | 265 | 99.2 | 589 | 573 |
| Bregy | K-6 | 587 | 22 | 411 | 1020 | 57.5 | 881 | 865 |
| Childs | K-6, Ex | 775 | 13 | 8 | 796 | 97.4 | 1177 | 1080 |
| Girard | K-6, Ex | 194 | 0 | 634 | 828 | 23.4 | 702 | 702 |
| Jackson | K-7, Ex | 313 | 4 | 100 | 417 | 75.1 | 797 | 781 |
| Landreth | K-6 | 417 | 2 | 1 | 420 | 99.3 | 766 | 750 |
| McDaniel | K-6, Ex | 734 | 6 | 5 | 745 | 98.5 | 941 | 909 |
| Peirce, W.S. | K-8, Ex | 372 | 1 | 1 | 374 | 99.5 | 737 | 705 |
| Poe | K-6, Ex | 431 | 9 | 46 | 486 | 88.7 | 702 | 572 |
| Smith | K-6, Ex | 538 | 2 | 1 | 541 | 99.4 | 886 | 854 |
| Stanton, E.M. | K-6, Ex | 431 | 0 | 3 | 434 | 99.3 | 672 | 640 |
| Wayne | K-6, Ex | 469 | 7 | 92 | 568 | 82.6 | 672 | 640 |
| Elementary Totals | | 6751 | 71 | 1309 | 8131 | 83.0 | 10956 | 10441 |
| Audenreid JHS | 7-9 | 754 | 1 | 2 | 757 | 99.6 | 1051 | 983 |
| Barratt JHS | 7-9 | 1011 | 0 | 0 | 1011 | 100.0 | 1341 | 1219 |
| Vare JHS | 7-9 | 1056 | 15 | 269 | 1340 | 78.8 | 1281 | 1254 |
| Secondary Totals | | 2821 | 16 | 271 | 3108 | 90.8 | 3673 | 3456 |
| SPA K Totals | | 9572 | 87 | 1580 | 11239 | 85.2 | 14629 | 13897 |

340

SPA O
1974-75 ENROLLMENTS

| Schools | Grade Organiz. | B | SS | W & O | Tot. | % B | Design Capac. | Use Capac. |
|---|---|---|---|---|---|---|---|---|
| Fell | K-7 | 60 | 4 | 448 | 512 | 11.7 | 815 | 815 |
| Hawthorne | K-6, Ex | 405 | 0 | 1 | 406 | 99.8 | 618 | 586 |
| Jenks, A.S. | K-7, Ex | 6 | 0 | 309 | 315 | 1.9 | 410 | 378 |
| Key | K-7, Ex | 173 | 13 | 321 | 507 | 34.1 | 850 | 834 |
| Kirkbride | K-8, Ex | 66 | 100 | 413 | 579 | 11.4 | 732 | 716 |
| Meredith | K-7, Ex | 281 | 30 | 51 | 362 | 77.6 | 691 | 594 |
| Nebinger | K-6, Ex | 464 | 59 | 56 | 579 | 80.1 | 940 | 924 |
| Read, F. | K-7 | 3 | 6 | 266 | 275 | 1.1 | 440 | 440 |
| Sharswood | K-7, Ex | 23 | 14 | 592 | 629 | 3.7 | 851 | 705 |
| Southwark | K-7, Ex | 286 | 179 | 69 | 534 | 53.6 | 1307 | 1242 |
| Taggart | K-7, Ex | 50 | 20 | 565 | 635 | 7.9 | 762 | 697 |
| Vare, A. | K-7, Ex | 93 | 48 | 418 | 559 | 16.6 | 811 | 779 |
| Washington, G. | K-8, Ex | 475 | 32 | 105 | 612 | 77.6 | 822 | 660 |
| Elementary Totals | | 2385 | 505 | 3614 | 6504 | 36.7 | 10049 | 9370 |
| Bartlett JHS | 8-9 | 418 | 7 | 57 | 482 | 86.7 | 1259 | 1164 |
| Furness JHS | 8-9 | 170 | 48 | 378 | 596 | 28.5 | 1269 | 1228 |
| Thomas JHS | 8-9 | 48 | 5 | 497 | 550 | 8.7 | 777 | 736 |
| Bok Voc-Tech | 10-12 | 1140 | 8 | 106 | 1254 | 90.9 | 2032 | 2032 |
| S. Phila. HS | 10-12 | 2263 | 97 | 1889 | 4249 | 53.3 | 2531 | 2450 |
| Secondary Totals | | 4039 | 165 | 2927 | 7131 | 56.6 | 7868 | 7610 |
| SPA O Totals | | 6424 | 670 | 6541 | 13635 | 47.1 | 17917 | 16980 |

The foregoing evidence of apparently curable conditions of racial imbalance are intended as examples only and not as limitations on what the District can or must do to bring itself into compliance with the statute. The District has learned from these proceedings that the Commission will approve a plan in which not every school must conform to its Recommended Element No. 3, and that the Commission accepts the fact that there are limitations on the amount of time children may be required to spend traveling to and from school. The District should understand, however, that improvement of the racial imbalance of its schools is necessary and that its accomplishment requires the expenditure of funds, if necessary at the expense of other programs. The Commission has now recognized that a rigid adherence to its *a priori* standards is not always possible. It will, we trust, also understand from the evidence at our hearings that the District's physical problems are unique in this Commonwealth. So also are its financial troubles.

Except for the fact that the Commission seems to have refused to consider any proposal which failed to integrate every school of the District according to its standard, we would unhesitatingly state that it has, by producing Dr. Foster's pupil reassignment plan, performed a service beyond the call of its responsibility. We do not hesitate to say that that plan has been most helpful to us and should be helpful to the Board and the community in their further consideration of what can be done.

We have mentioned that the onus of preparing a plan for integration is on the District. Since we are unwilling to enforce the Commission's order by implementing any of the proposals which have been exhibited to us, we are compelled reluctantly to refer the matter back to the District for the preparation of a new plan for the Commission's and, if necessary, our consideration. We expect, and will require the District to make a realistic and effective proposal to integrate its schools; we expect

the Commission in reviewing the District's submission to do so in practical, not doctrinaire, fashion.

ORDER

AND NOW, this 13th day of February, 1976, the respondent School District of Philadelphia is Ordered to prepare and submit to the Pennsylvania Human Relations Commission for its review and approval a definitive plan and timetable for the practical cure in its schools of conditions of racial imbalance as defined by Recommended Element No. 3 of the Commission; provided that such plan shall in general not require pupils transported as the result of reassignment under the plan to be on a bus more than forty-five minutes a day each way to or from school. The plan shall include written justification for each instance in which it is proposed that a school shall remain racially imbalanced.

The District shall submit the plan and timetable to the Commission on or before July 1, 1976 and at the same time submit the same to the Department of Education of the Commonwealth for its recommendations as to educational content.

The Pennsylvania Human Relations Commission is Ordered promptly to review the plan and timetable and, after discussion with the District and, if indicated, jointly with the District and the Department of Education, approve or disapprove the same, in whole or part. If the Commission finds the plan and timetable to be objectionable, in whole or part, it shall state such objections in writing and with particularity.

We retain jurisdiction, to be exercised in the event there is an appeal by the District should the Commission disapprove the plan and timetable submitted hereunder or if there is further petition of the Commission for enforcement of its order if the District shall fail to comply with this Order by failing to file a plan and timetable or shall file a plan and timetable which the Commission does not finally approve.