Pennsylvania Human Relations Commission, Petitioner *v.* School District of Philadelphia, Respondent.

Harry and Annemarie Gwynne et al., Intervenors.

Argued November 17, 1981, before President Judge CRUMLISH and Judges MENCER, ROGERS, CRAIG and MACPHAIL.

*Robert S. Mirin,* General Counsel, with him *Claudette R. Spencer,* Assistant General Counsel, for petitioner.

*Martin Horowitz,* Assistant General Counsel, with him *Eugene F. Brazil,* General Counsel, for respondent.

*Daniel Sherman,* for intervenors.

OPINION BY JUDGE ROGERS, April 15, 1982:

The Pennsylvania Human Relations Commission having determined that the voluntary plan for the de-

segregation of the Philadelphia public schools, which was approved and ordered to be implemented by this Court, is not accomplishing desegregation as required by Pennsylvania law asks us to order the school district to file with the Commission a new plan for the desegregation of its schools containing mandatory features.

The history of the litigation growing out of the efforts of the Commission to constrain the School District of Philadelphia to plan for and accomplish correction of racial imbalance in most of its schools and of the school district's responses to the Commission's efforts is recited at length in the case books and needs no repeating here. *See Pennsylvania Human Relations Commission v. School District of Philadelphia*, 30 Pa. Commonwealth Ct. 644, 374 A.2d 1014 (1977) *aff'd* 480 Pa. 398, 390 A.2d 1238 (1978); *Human Relations Commission v. The Philadelphia Schools*, 23 Pa. Commonwealth Ct. 312, 352 A.2d 200 (1976); *Philadelphia School District v. Human Relations Commission*, 6 Pa. Commonwealth Ct. 281, 294 A.2d 410 (1972).

For present purposes it suffices to note that the 1976 Voluntary Desegregation Plan submitted by the School District and now challenged as insufficient by the Commission was approved by this court and, on appeal, by the Supreme Court. *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 30 Pa. Commonwealth Ct. 644, 374 A.2d 1014 (1977); *aff'd*, 480 Pa. 398, 390 A.2d 1238 (1978). With that approval, we entered the following order:

Now, July 1, 1977, the Petition for Enforcement is denied and the School District of Philadelphia is ordered to proceed with the detailed development and implementation of the July 1976 School District of Philadelphia Desegregation Plan, to be initiated in September of 1978. In the event that by February 1980, the

Pennsylvania Human Relations Commission determines the plan is not accomplishing desegregation as required by Pennsylvania law, this Court retains jurisdiction for such further action as it then deems appropriate.

*Id.* 30 Pa. Commonwealth Ct. at 645, 374 A.2d at 1016.

In July, 1980, the Commission filed with this Court an "Application for Rule to Show Cause Why the School District of Philadelphia Should Not Be Ordered to Submit a New Mandatory Desegregation Plan Which Will Guarantee the Desegregation of Its Schools" in which it averred *inter alia* that

3. As of Fall 1975, 10% or thirty (30) out of two-hundred and ninety-three (293) schools in the Philadelphia public school system were desegregated. As of January 1980, 11% or thirty-three (33) out of two-hundred and eighty-eight (288) schools were desegregated. This represents an increase of 1% or three (3) schools.

. . . .

10. As of January 1980, one-hundred and two (102) out of two-hundred and eighty-eight (288) schools in Philadelphia were over 95% one race.

11. As of Fall 1975, 10% or 24,424 out of 263,140 students were attending desegregated schools. As of January 1980, 11% or 25,651 out of 233,892 students were attending desegregated schools. This means that 208,241 students or 89% are still attending segregated schools.

12. In a document adopted by the Board entitled 'Proposed Plans for Implementation of Voluntary Desegregation' dated April 24, 1978 (a copy of which is attached as Exhibit 'B'), Respondent named fifty-five (55) schools that it projected would be desegregated by September 1979.

13. Respondent has not achieved its own desegregation goals for September 1979 since 82% or forty-five (45) of the fifty-five (55) schools were still segregated as of September 1979.

The Commission asked that

a rule be granted upon Respondent school district of Philadelphia to show cause why it should not be ordered to submit a new desegregation plan embodying traditional mandatory methods which will realistically desegregate the Philadelphia School System forthwith and such other relief as this Court deems appropriate and proper.

The school district admitted the allegations contained in Paragraph 10 and 12 of the Application and denied the other allegations set forth above on the sole ground that, in the district's view, in preparing the statistics contained therein the Commission improperly and unfairly employed a definition of the term "segregated school" which had been promulgated by the Commission at the very end of the period specified by this Court for the implementation of the plan.

Following the exchange of interrogatories and a pretrial conference conducted on September 15, 1980, four days of evidentiary hearings were held in Philadelphia in January, 1981.

A great deal of effort has been devoted by the district and the Commission in an attempt to persuade this Court of the propriety of the various conceptual tools used to measure the district's progress pursuant to the voluntary plan. Specifically, the parties have derived three definitions of the crucial term "segregated school":

(a) The Commission's 1968 definition: according to this definition a segregated school is one in which the proportion of Negro pupils is not

within 30% of the average proportion of Negro pupils in district schools of the same grade span. This definition first appeared in the Commission's May 15, 1968, document entitled 'Recommended Elements of a School Desegregation Plan.' Subject to court challenge, this definition was approved by this Court and by our Supreme Court in Pennsylvania Human Relations Commission v. Norristown School District, 20 Pa. Commonwealth Ct. 555, 342 A.2d 464 (1975) aff'd 473 Pa. 334, 374 A.2d 671 (1977). This definition was in effect at the time of our 1977 Order retaining jurisdiction during the planning and implementation period. The district contends that this definition is not usable in Philadelphia due to the high proportion of black students in certain grade spans. Several of the Commission's witnesses, including Roy Yaffe, former assistant general counsel to the Commission, and Richard Anliot, the Commission's Director of the Division of Education, support this contention. Indeed, it was precisely this objection that led the Commission to formulate its 1979 definition.

(b) The Commission's 1979 definition: according to this definition a segregated school is one which either has less than 25% white enrollment or less than 40% black enrollment unless the school contains at least 20% Hispanic enrollment in which case it is segregated if it also contains less than 25% black enrollment. The school district argues, with some force, that it would be unfair for this Court to judge the district's performance by means of this definition since it was not announced by the Commission until some time after December 17, 1979, near the end of the implementation period.

(c) The school district's 1978 definition: according to this definition a segregated school is one which contains either less than 25% white enrollment or more than 75% white enrollment. As we will discuss, the Commission and its expert witness, Dr. Foster, have serious objections to the use of this definition in measuring progress pursuant to the 1976 voluntary plan.

Of course, any determination of the degree to which the School District of Philadelphia has, through the implementation of its voluntary plan, made progress in desegregating its schools will depend on some device for the measurement of the extent to which the district was segregated before the implementation of the plan and the extent to which that segregation has thereafter decreased. The presence of substantial objections to each of the definitional devices used for this purpose by the parties can only be said to have complicated the already difficult task before this Court.

It is the testimony of Homer Floyd, the Commission's Executive Director, that employees of the Commission first met with district staff members in September, 1979, for the purpose of obtaining from the district enrollment data necessary to evaluate progress pursuant to the 1976 voluntary plan. Following receipt of the requested information and its analysis by the Commission's staff, an ad hoc committee of the Commission consisting of Commissioners Loewenstein, Echols, Leader, and Scott, reported to the Commission and to the Board of Education that, in their judgment insufficient progress had been demonstrated to warrant the committee's recommendation to the full Commission that the plan receive the Commission's continued support.

The committee then recommended on February 25, 1980 that further discussions be held with the district

to determine whether additional progress was possible in the absence of substantial modification of the voluntary plan. On March 3, 1980, it was indicated to the district that additional evidence had to be received by the Commission by April 15, 1980 in support of the district's contention that the voluntary plan was a sufficient response to its duty under the law to desegregate the public schools. When no such additional support was forthcoming by the date indicated, the Commission, on April 28, 1980, adopted a resolution expressing its judgment that progress under the 1976 Voluntary Plan was insufficient and authorizing the pursuit of available legal remedies to effect modifications of the voluntary plan.

Mr. Floyd further testified that the Commission is not opposed to the use of its 1968 definition in evaluating the effectiveness of the voluntary desegregation plan although the Commission would favor for the use of its 1979 definition. The Commission strongly opposes the use of the school district's 1978 definition because the school district was, in the Commission's view, without power to promulgate such a definition, because the definition is invalid in classifying as desegregated a school in which the proportion of white students is 75% although the proportion of white students in the district as a whole is only 40% and because, in Mr. Floyd's studied opinion, use of the definition would have the effect of placing a disproportionate share of the burden of the desegregation effort on black students by requiring greater reassignment of black students than of their white counterparts.[1]

---

[1] Several witnesses, as we indicate, expressed their opinion that the district's voluntary plan has placed a disproportionate share of the burden of the desegregation effort on black students and their families. No evidence on this issue was adduced and we do not know, for example, the relative numbers of black and white children that have been reassigned or must be transported beyond their neighbor-

It is the opinion of Mr. Richard B. Anliot, for the last twenty-two years the Director of the Commission's Division of Education and the Commission's staff member primarily responsible for the analysis of enrollment data provided by the district, that although the voluntary plan has expanded the educational opportunities available to public school students in Philadelphia it has not, as evidenced by the statistics set forth as factual findings one through three below, ac-

hood schools as a result of efforts pursuant to the plan or whether any such children have thereby suffered ill-effects. However, we share the concern of the expert witnesses who have testified, as well as other commentators and the courts of other jurisdictions, that a remedial desegregation plan which shifts the whole of the burden of the remedy onto black children is both inequitable and ineffective. This criticism is particularly addressed to plans which involve the wholesale reassignment of black students to formerly all or nearly all white schools without a corresponding movement of white students to formerly all or nearly all black schools. *See Evans v. Buchanan*, 582 F.2d 750, 760-761 (3d Cir. 1978). The deleterious effect such a plan may have on the pupils reassigned was described by the court in the leading case of *Brice v. Landis*, 314 F. Supp. 974 (N.D. Cal: 1969) :

> The minority children are placed in a position of what may be described as second-class pupils. White pupils, realizing that they are permitted to attend their own neighborhood schools as usual, may come to regard themselves as 'natives' and to resent the Negro children bussed into the white schools every school day as intruding 'foreigners'. . . . This undesirable result will not be nearly so likely if the white children themselves realize that some of their number are also required to play the same role at Negro neighborhood schools.

*Id.* at 978. *See Mitchell v. McCunney*, 651 F.2d 183 (3d Cir. 1981) ("In their new schools plaintiffs may risk social ostracism . . . as well as the rancor of the residents of the community to which they travel") ; *Lee v. Chambers County Board of Education*, 533 F.2d 132 (5th Cir. 1976) (equitable allocation of the transportation burden is particularly important in considering a voluntary desegregation plan) ; Taylor, Summary of Cases and Legal Issues in School Desegregation, 19 Howard Law Journal 24, 25 (1975).

complished "substantial progress towards desegregation during [the period between the fall of 1977 and the fall of 1980]." Mr. Anliot particularly emphasizes that even by the school district's more favorable definition, the number of black segregated schools, *i.e.* those with a proportion of black students in excess of 75%, has only decreased by 2% since 1977.

Additional desegregation methods which have been suggested by the Commission and by the district's staff but which are not a part of the voluntary plan and have not been adopted by the school board include the reassignment so as to further desegregation of pupils enrolled in schools which must be closed on account of a decline in enrollment or for other reasons; the mandatory "pairing" or "clustering" of contiguous segregated schools if the resulting combined attendance area would permit the reassignment of pupils so as to create desegregated institutions; and an increase in financial commitment to the district's magnet programs.

It is the policy of the Board of Education to require no pairing of contiguous schools without regard to the furtherance of desegregation which could be thereby achieved. Pairings to advance desegregation are suggested by the district but are permitted to proceed only if a consensus can be reached with the staff, administration, and community of the particular schools involved.

It is the opinion of Dr. Gordon Foster, professor of education at the University of Miami, Florida and the editor, author or contributor to over forty studies or surveys in the area of school desegregation, that the school district's 1978 definition is unacceptable for use in a predominantly black school district like Philadelphia. Dr. Foster further testified that the Commission's 1968 definition is similar to the definitions used by many agencies and school districts across the coun-

try and is appropriate for use in Philadelphia although a certain "awkwardness" results when the definition is applied to schools in grade spans with an extremely high proportion of black pupils. Dr. Foster's opinion, based on an analysis of the trend implicit in the evidence, is that a maximum of 10,000 additional students will become enrolled in desegregated schools as a result of continued efforts pursuant to the voluntary plan. In addition, it is Dr. Foster's opinion that voluntary plans have generally had limited success in northern cities and that the voluntary plan of the School District of Philadelphia has proved to be unacceptable in practice by placing the burden of the desegregation effort on black students and their parents and by failing to result in the desegregation of identifiably black schools.

Dr. Foster testified that from his review of the data admitted into evidence, the increase in desegregation accomplished by implementation of the voluntary plan has been, primarily, the result of the transportation of black students to formerly all-white or predominantly white schools for the most part located in the northeastern section of the city. Therefore, in Dr. Foster's opinion, if the transportation of students to schools outside of their neighborhood is a burden on those students and their parents, equity on a racial basis in the allocation of this burden has not been achieved by implementation of the voluntary plan.

Dr. Foster further testified that his review of the statistical evidence revealed no school which contained a proportion of black students in excess of 90% in 1977, before the implementation of the voluntary plan, which has been desegregated as a result of efforts pursuant to the plan. In Dr. Foster's opinion this observation, if borne out by a more exhaustive examination of the data provided by the school district, would constitute a particularly forceful indictment of the volun-

tary plan because the "root goal" of a desegregation effort, in Dr. Foster's view, ought to be a decrease in the racial isolation of black students in the district by means of a decrease in the number of all black or nearly all black schools.

Dr. Richard D. Hanusey, the district's associate superintendent in charge of coordinating the desegregation effort in terms of program design, staff development, community relations, student and staff transfers, allocation of instructional materials, equipment and supplies, pupil transportation and funding testified that the following programs, at a combined cost of approximately $12 million, have been created since 1977 as part of the voluntary plan:

(A) Magnet Schools: The High School for Creative and Performing Arts, the High School for Engineering and Science, the Middle School for Science and Mathematics. Each of these programs is desegregated by the school district's definition and each provides an accelerated curriculum in a particular discipline for students who have demonstrated an interest and aptitude in that discipline.

(B) The Girard Academic Music Program (GAMP) is a desegregated program in which all students enrolled in the Girard Annex (grades 5-9) receive special instruction in the areas of vocal and instrumental music.

(C) The Edison Satellite Program is a desegregated course of study encompassing an experimental curriculum designed to meet the needs of talented tenth through twelfth graders who have not achieved their demonstrated potential in the context of a regular school experience.

(D) The Academy for Academic Excellence is a desegregated program located in the John

Story Jenks School emphasizing basic and traditional academic disciplines.

(E) The Academic Academy for Middle Years emphasizes basic and traditional academic disciplines and offers 'enriched' foreign language, math, and science courses involving greater teacher contact to students in the sixth through eighth grades. The Academic Academy for Middle Years is not desegregated by any of the definitions previously described.

(F) The Shawmont Academic Music Program (SAM) is a desegregated program providing instruction to interested elementary students in vocal and instrumental music as well as musical theory and performance.

(G) The Kensington Youth Program (KEY) is a desegregated program providing individualized and specialized instruction including career development to students in the tenth through twelfth grades who are considered to be among those otherwise unlikely to complete their high school education.

(H) Instructional Enrichment Centers providing additional staff and other resources and added emphasis on basic math, reading and science skills have been initiated in thirteen formerly segregated elementary and junior high schools. They have enjoyed limited success in furthering desegregation.

(I) Basic Skills and Unified Arts Programs created within two elementary schools provide individualized instruction in the areas of art, music, dance, language arts and drama. One of these programs is desegregated.

(J) Multi-language and Multi-Cultural Programs, created within three desegregated elementary schools, provide intensive instruc-

tion in English as a second language, including parent tutorials, to Hispanic students. None of these programs are to date large enough to desegregate the schools in which they are located.

(K) Child Development Centers (CDC's) have been created in three segregated elementary schools to provide full-day kindergarten and day care services. One school has been desegregated as a result of the addition of a CDC.

(L) Academic Plus Magnet Schools provide at two locations greater structure and discipline, regular homework, a dress code and minimum requirements for promotion to pupils in the elementary grades and, at one location, to pupils in grades six through eight. One of these programs is desegregated.

(M) The Alternative for Middle Years Program (AMY) and the Middle Years Alternative for the Humanities (MYA), at three locations, provide a specialized curriculum for sixth through eighth graders interested in the study of ancient and modern human cultures. These programs are desegregated.

(N) Citywide Special Admission Schools include Central High School and Philadelphia High School for Girls, the Conwell Middle Magnet School, the Franklin Learning Center, the five component Parkway Program, the Masterman Laboratory and Demonstration School and the Saul High School of Agricultural Sciences. All of these programs are open to public and non-public school children who meet certain pre-admission, application, testing and interviewing requirements. Racial controls on enrollment are designed to ensure that the programs are desegregated. Several of the Special Admission Schools pre-date the voluntary plan.

(O)  Two separate contiguous school pairings have been encouraged and effected by Dr. Hanusey and his staff as part of the voluntary plan. These involve the Powers Elementary School combined with the Willard Elementary School and the 'Girard/Poe pairing' which has resulted in the Girard School serving kindergarten and grades one through four and the Girard Annex serving the fifth through seventh grades.

The difficulties posed by implementation of the voluntary desegregation plan in the fall of 1978 were greatly increased, in Dr. Hanusey's opinion, by teacher union activity during that period and by the requirement by federal authorities that approximately 4,000 professional staff members of the district be reassigned as the result of a determination by those authorities that the district's staffing policies were in violation of federal civil rights laws. Additional difficulties were created by the failure of expected and approved funding pursuant to the federal Emergency School Assistance Act to materialize on schedule. Other obstacles to rapid desegregation of the Philadelphia school district, in Dr. Hanusey's view, include the geographic size of the district, the degree to which neighborhoods within the district are segregated, and the presence of an extensive and well-established parochial alternative to public education.

In Dr. Hanusey's opinion, approximately 12,000 additional students will be involved in desegregated education in the 1981-1982 school year as a result of continued efforts with respect to the voluntary plan. Thereafter, assuming a constant funding level, approximately 10,000 additional students can be expected to participate in desegregated educational experience as a result of the plan. At that unspecified point in the future, assuming the indefinite continuance of ef-

forts pursuant to the voluntary plan, approximately 84,000 students (of the now about 224,000) will be enrolled in desegregated schools. It is Dr. Hanusey's opinion that this represents the maximum level of desegregation achievable by wholly voluntary means.

In Dr. Hanusey's view the great advantage of pursuing a course of deliberate voluntarism in the desegregation of the Philadelphia schools is the possibility of thereby achieving some measure of desegregation while avoiding community unrest. Moreover, the particular programmatic additions resulting from the efforts of Dr. Hanusey and his staff have created, as he described it, a veritable "smorgasbord of [educational] opportunities" for Philadelphia public school students.

On May 27, 1980, Dr. Hanusey submitted for action by the Board of Education a suggested resolution mandating seventeen separate pairings of contiguous schools in order to further the desegregation effort. Dr. Hanusey testified that he remains convinced of the necessity of requiring the combination of the schools specified in the proposed resolution but that despite his counsel to that effect to the Board of Education, the proposed resolution has been defeated. However, the Board of Education has taken steps, at the urging of Dr. Hanusey, to revise pupil transfer policies so as to ensure that the desegregation effort is not circumvented by individual students and their families; to develop new magnet programs affiliated with the city's universities; to expand existing magnet programs; and to subsidize the transportation costs of students who volunteer to attend other than their neighborhood school in order to further the desegregation effort.

On cross-examination Dr. Hanusey conceded that his projections of additional gains to be accomplished through continued voluntary efforts are optimistic

and include among the schools anticipated to be de-
segregated in the near future certain named schools
which have experienced in recent years increasing seg-
regation. This apparent anomaly is explained by the
expectation that increased funding will permit addi-
tional programs to be placed in the schools specified
and that these programs will result in the desegre-
gation of the host schools.

On the subject of the level of funding necessary to
sustain the voluntary desegregation effort and to make
possible the projected additional gains set forth above,
Dr. Hanusey testified that he would require in the
1981-1982 school year at least $14 million in combined
local and federal (ESAA) support. Whether this level
of funding would be forthcoming was not known at the
time of the hearing.

Dr. Robert L. Crain, senior social scientist for the
Rand Corporation in Washington, D.C., principal re-
search scientist with Johns Hopkins University in Bal-
timore, Maryland and the author of four texts and nu-
merous articles, studies and surveys on the subject of
school desegregation, was called by the school district
and testified that he had been hired by the district to
act as a consultant with regard to the instant litigation
and that he had in that role reviewed the particulars of
the district's voluntary desegregation plan as well as
the evidence previously adduced.

Dr. Crain testified that in his opinion and from his
understanding of the relevant scholarly research, an
effective integrated school is any school with a propor-
tion of white students between 20% and 80%. For
schools with less than 20% white students Dr. Crain
testified that such schools become identified as black
schools with an inevitable reduction in the level and
qaulity of services provided to the students due to a
decrease in community and administrative support.

Dr. Crain further testified to the inherent limitation of any conceptual tool, including the three definitions previously described, used to measure desegregative progress which contains a threshold element such that only schools which are above the threshold are considered to be desegregated. By their nature such definitions ignore significant progress within particular schools if, following efforts pursuant to a desegregation plan, the racial characteristics of the student population falls just below the threshold.

Dr. Crain testified that this limitation can be overcome through the use of a statistical construct known to researchers in the field as the "Desegregation Index." In Dr. Crain's opinion the Desegregation Index, which is calculated with reference to the number and proportion of students of each race in each district school in each of the years at issue, has been for twenty years an accepted mathematical tool for measuring progress in school desegregation and is appropriate and useful for application to the Philadelphia schools. The advantage of the Desegregation Index, in Dr. Crain's view, is that it is not dependent on a definition of segregated schools but, instead, measures desegregative progress on a pupil by pupil basis; accurately and sensitively reflecting each student reassignment accomplished by the district in the furtherance of the ultimate goal of having each school mirror, to the extent possible, the racial characteristics of the district as a whole. Dr. Crain was unable to provide precise figures, apparently due to the magnitude of the task, with respect to the application of the Desegregation Index to the Philadelphia School District. He estimated that such an analysis would reveal an increase in district wide desegregation of approximately 15% as a result of efforts pursuant to the voluntary plan.

In Dr. Crain's opinion, based primarily on his field research and that of Dr. Christine Rossell of Boston

University, a desegregation effort which proceeded at a less deliberate pace than that adopted by the district or which embodied to a greater extent mandatory tactics would have a more disruptive effect on the city as a whole and would result in a massive exodus of white students from the public schools thereby undermining the possibility of achieving the goal sought. In this regard Dr. Crain particularly emphasized the presence, as an alternative to public schooling, of the school system operated and maintained by the Philadelphia Archdiocese.

On cross-examination Dr. Crain conceded that Dr. Rossell, whose writings he had relied on in earlier testimony, in addition to her conclusions with respect to the spectre of "white flight," has also written that experience with voluntary desegregation plans has shown such plans to place a disproportionate share of the burden of pupil transportation on black students and that voluntary plans, while they reduce the exodus of white students during the process of desegregation, do not, in districts like Philadelphia which contain a minority enrollment of greater than 30%, produce an acceptable level of desegregation.

### Factual Findings

On the basis of the testimony summarized above as well as the uncontradicted statistical evidence of record we find the following facts to have been established:

(1) As measured by the Commission's 1968 definition; of the 294 schools in the district in the fall of 1977, 51 or 17% were desegregated and of the 287 district schools in the fall of 1980, 57 or 20% were desegregated. By the same definition; of the 250,932 students attending schools within the district in the fall of 1977, 38,644 or 15% attended desegregated schools and of the 224,339 district students in the fall of 1980, 40,180 or 18% attended desegregated schools. By this

definition, therefore, in terms of both schools and students, implementation of the district's voluntary plan has increased the proportion of desegregated experience available to the students of the district by three per cent.

(2) As measured by the Commission's 1979 definition; of the 294 district schools in the fall of 1977, 30 or 10% were desegregated and of the 287 district schools in the fall of 1980, 37 or 13% were desegregated. By the same definition; of the 250,932 district students in the fall of 1977, 23,705 or 9% attended desegregated schools and of the 224,339 district students in the fall of 1980, 26,453 or 12% attended desegregated schools. By this definition, therefore, as was true under the Commission's 1968 definition, implementation of the district's voluntary plan has increased the proportion of desegregated schools and pupils in those schools by three per cent.

(3) As measured by the school district's 1978 definition; of the 294 district schools in the fall of 1977, 54 or 18% were desegregated and of the 287 district schools in the fall of 1980, 79 or 28% were desegregated. By the same definition; of the 250,932 district students in the fall of 1977, 43,593 or 17% attended desegregated schools and of the 224,339 district students in the fall of 1980, 62,255 or 28% attended desegregated schools. By this definition, therefore, implementation of the district's voluntary plan has increased the proportion of desegregated schools by 10% and has increased the proportion of students attending desegregated schools by 11%.

(4) As of November 1, 1977, before the commencement of efforts under the voluntary plan, 113 Philadelphia Schools contained a proportion of black students in excess of 90%. On the last day in October, 1980, the number of such schools was 111. Of the 113 schools in 1977, nine are not included in the set of those schools

with greater than 90% black populations in 1980.
Since the total number of such schools in 1980 has de-
creased by only two it is clear that some schools have
become increasingly segregated over the period. Of
the nine schools with greater than 90% black popula-
tions in 1977 which are not included in the set of such
schools in 1980, seven have been, during the interim,
closed and the pupils there enrolled have been, in each
instance, reassigned to schools as segregated as the
schools in which they were previously enrolled. Thus,
as Mr. Anliot testified, valuable opportunities to fur-
ther desegregation have been lost by the district. Of
the remaining two schools, in each case the propor-
tionate decline in black enrollment is the result of an
increase in the enrollment of Asian and Hispanic stu-
dents and not due to any increase in the proportion of
caucasian students or to any program initiated as a
part of the voluntary plan. It is therefore clear that
Dr. Foster's observation is correct and that no school
which contained a proportion of black students in ex-
cess of 90% before 1977 has been desegregated as a
result of the district's efforts to date.

The number and proportion of black pupils in these
overwhelmingly segregated schools has declined only
slightly over the period. In 1977, 107,619 black stu-
dents or 69% of the 155,706 black students enrolled in
the district attended schools containing a proportion
of black students in excess of 90%. In 1980, 92,997
black students or 66% of the total were enrolled in
such schools. Thus today as in 1977 over two-thirds of
all the black public school students in Philadelphia
attend schools that are racially isolated containing
proportions of black students in excess of 90%. (See
TABLE's I and II.)

### DISCUSSION

As we have indicated, the narrow issue presently
before us is that of whether the Commission's deter-

mination that there has been insufficient progress toward the desegregation of Philadelphia's public schools as the result of efforts pursuant to the 1976 Voluntary Plan is adequately supported by the evidence of record. It is worthy of note that each of the litigants for the most part accepts the evidence adduced by the other. Each, of course, disputes the other's conclusions.

The school district does not contend that the Commission has, through its aggregate statistics premised on each of the three definitions, misrepresented the number of schools that have become desegregated since 1977 or the number of students in those schools. Neither does the Commission contest that the multitude of programs to which Dr. Hanusey made detailed reference have been created pursuant to the voluntary plan, are presently functioning at various locations throughout the City, and are providing valuable educational opportunities for the school children of Philadelphia. In this regard we note that this Court was impressed, as indeed were some of the Commission's witnesses, with Dr. Hanusey's and his staff's sincerity and evident desire to do all that is possible within the constraints imposed by the Board of Education and the physical characteristics of the district to effect desegregation.

The question before us, however, is not whether the district has tried but whether, when the distribution of students of various races in the district's schools is viewed as a whole, its efforts have succeeded or are likely in the future to succeed. As to this issue it seems to us to matter little whether we employ the disrict's 1978 definition, demonstrating progress on the order of 10%, or the Commission's two definitions under which the district is shown to have increased the number of desegregated schools and pupils in those schools by approximately 3%. We note in this regard, how-

ever, that if the choice of definitions were significant it is clear that the applicable definition would be the one in effect at the time of our July 1, 1977 Order in this case, the Commission's 1968 definition. On this record, containing the opinions of experts and experienced employees of the Commission to the effect that betterment of neither 3% nor 10% compares favorably with what has been accomplished in similar districts elsewhere or represents all that can be realistically expected of the School District of Philadelphia, we are unwilling to substitute our judgment finally for that of the Commission to the effect that the progress under the voluntary plan has thus far been insufficient.

We are particularly troubled by the testimony of Dr. Foster that the voluntary plan has entirely failed to accomplish the desegregation of those schools which, prior to the implementation of the plan, contained an overwhelming proportion of black students; our reexamination of the enrollment data provided by the school district and summarized in finding four above convinces us that Dr. Foster is quite correct.

We are in complete argreement with Dr. Foster that a fundamental purpose of any well-conceived desegregation effort must be to desegregate the identifiably black schools in the district and to diminish to the extent possible the racial isolation of black public school students. Indeed our Supreme Court has written that the evil to be addressed by the Commission is precisely that presented by the now well-established proposition "that the education offered pupils in all-Negro or substantially all-Negro schools is inherently inferior to that offered in integrated schools." *Philadelphia Human Relations Commission v. Chester School District*, 427 Pa. 157, 175, 233 A.2d 290, 299-300 (1967); *see Brown v. Board of Education*, 347 U.S. 483 (1954). *See also James C. Coleman et al., Equality of*

*Educational Opportunity (The Coleman Report),* United States Office of Education (1966) (predominantly Negro schools are qualitatively inferior to their white and integrated counterparts in terms of student achievement, professional staff experience and credentials, texts and libraries, and availability of such academic extracurricular activities as school newspapers and debating societies).

The district must not be content with and we will not grant our imprimatur to a desegregation effort which, however successful in desegregating schools which formerly contained all or nearly all white students, is unsuccessful in accomplishing the desegregation of schools which contain all or nearly all black students. In the desegregation of predominantly black schools it is clear that voluntary methods have proven to be insufficient. One powerful weapon in the arsenal of desegregation methods which, although recommended by its staff, the Board of Education has steadfastly refused to employ but which would directly ameliorate this failing is the pairing and combining of the students of neighboring schools where such combination will further desegregation. We have suggested on several occasions that such pairings be accomplished. *See Pennsylvania Human Relations Commission v. Philadelphia School District,* 30 Pa. Commonwealth Ct. 644, 650, 374 A.2d 1014, 1017 (1977) (concurring and dissenting opinion of Rogers, J.); *Pennsylvania Human Relations Commission v. School District of Philadelphia,* 23 Pa. Commonwealth Ct. 312, 352 A.2d 200 (1976). The instant record supports no conclusion other than the necessity and advisability of the combination of those schools specified in the proposed resolution of Dr. Hanusey dated May 27, 1980. In addition, on this record there is no justification suggested or apparent for the continued refusal of the

Board of Education to reassign pupils of closed schools so as to further the desegregation effort.

Notwithstanding the serious failings of the 1976 plan, we are not prepared to compel the district to abandon the voluntary efforts in view of the short time they have been employed, the not insignificant improvements they seem to have effected and the hopeful predictions of some of those who testified. We remain mindful of the great difficulties, unique among the school districts in this Commonwealth, faced by Philadelphia in its attempt to accomplish an acceptable degree of racial balance in its public schools. Indeed, as the Commission's witnesses concede, the complete desegregation of the district's schools, in the light of the geographic and demographic problems, may not be feasible without the necessity of transporting students over distances and for periods of time which would endanger their well being. The Commission has long conceded that no child should be required to be on the school bus longer than forty-five minutes one way to or from school.

At the suggestion of Dr. Crain we have, with the following results, subjected the enrollment data provided by the district to the calculations which constitute the Desegregation Index. In 1977 the average black student in the Philadelphia School District attended a school that contained a proportion of white students of 9.3%. Since the district as a whole contained 32% white students in 1977 and since implicit in the Index is the assumption that a school district is completely desegregated when the average student is enrolled in a school whose racial composition perfectly reflects the racial composition of the district as a whole, the School District of Philadelphia in 1977 had already travelled 29% [9.3% (actual proportion of white students) divided by 32% (maximum proportion of white students)] of the distance toward complete

desegregation. In 1980, after approximately one school year of voluntary efforts pursuant to the 1976 plan, the average black student in the Philadelphia public schools attended a school which contained a proportion of white students of 11.64%. Since the enrollment of white students in the district as a whole declined to 28.8% during the period from 1977 to 1980, the district has now travelled 40% [11.64% (actual proportion of white students (divided by 28.8% (maximum proportion of white students)] of the distance toward complete desegregation.

While we do not suggest that these figures ought to supplant the definition dependant statistics produced by the Commission, the calculations just reviewed do help to place the 3% absolute gain in desegregated schools in some perspective and to indicate that the voluntary plan has not been without effect worthy of reasonable continued support. However, it is equally clear that even with regard to the predominantly white schools that have primarily benefited from the district's voluntary efforts, a great deal of progress remains to be effected and that the possibility of additional gains is completely dependent on the district's level of financial commitment to the many exciting programs now in their infancy. As we have indicated, Dr. Hanusey was unable at the time of the hearings in this case, to inform the Court as to the funding available for the voluntary plan for the year 1981-1982 and of course we have no information on that or the projects for the year 1982-1983. Dr. Hanusey testified that he required $14,000,000 combined federal and local funding for 1981-1982.

## Conclusion

In conclusion we decide, as have other courts faced with the same issue and comparable facts, that a desegregation plan which leaves unaffected a substantial

number of racially identifiable schools containing a high proportion of black students is insufficient especially where it appears that the employment of such traditional desegregation methods as pairing and clustering would accomplish a rapid and significant decrease in the racial isolation of black students. *See Miller v. Board of Education of Gadsden, Alabama,* 482 F.2d 1234 (5th Cir. 1973); *Kelley v. Metropolitan County Board of Education of Nashville, Tennessee,* 463 F.2d 732 (6th Cir. 1972); *Lee v. Macon County Board of Education,* 448 F.2d 746 (5th Cir. 1971); *Allen v. Board of Public Instruction of Broward County, Florida,* 432 F.2d 362 (5th Cir. 1970). However, we conclude that the school district's voluntary desegregation program has, in addition to educational merit, effected the desegregation of some of the district's schools and that significant additional gains are likely if the district maintains its financial commitment to the program so that we will not grant the Commission's application that an entirely new plan with mandatory elements, presumably in replacement of the Voluntary Plan, be submitted; but we will direct the School District to modify its plan to achieve more comprehensive desegregation.

Accordingly we enter the following

ORDER

AND Now, this 15th day of April, 1982, we order that the School District of Philadelphia shall modify its 1976 Voluntary Desegregation Plan to correct racial imbalance, *as measured by the Pennsylvania Human Relations Commission's new (1979) definition of a segregated school,* suggesting that in so doing serious consideration be given to the following:

(1) the pairing of elementary schools recommended by Associate Superintendent Hanusey and his staff by proposed resolution appearing as Exhibit D-15 in this record; and

(2)    the reassignment of pupils affected by school closings in a fashion which will promote desegregation rather than perpetuate segregation.

Such modifications shall be submitted to the Pennsylvania Human Relations Commission on or before July 1, 1982.

This court shall retain jurisdiction until further order of the court.

Judge PALLADINO did not participate in the decision in this case.

---

## TABLE   I

### SCHOOLS WITH GREATER THAN 90% BLACK POPULATION AS OF 11/01/77

| Name | # of Black Students |
| --- | --- |
| Franklin B. HS | 1717 |
| Gratz Simon HS | 3186 |
| Germantown HS | 3717 |
| King Martin Luther HS | 3161 |
| Overbrook Sr HS | 3163 |
| Penn William HS | 2499 |
| University City HS | 2824 |
| West Phila Community HS | 75 |
| West Phila. HS | 2989 |
| Bok Edward Voc/Tech | 1332 |
| Dobbins Murrell V/T | 2232 |
| Audenried Chas. Y. Jr HS | 645 |
| Barratt Norris S Jr HS | 870 |
| Beeber Dimner Jr HS | 1320 |
| Fitzsimons Thomas Jr HS | 1305 |
| Gillespie Elizabth Jr HS | 1362 |
| Sayre William L Jr HS | 1720 |
| Shaw Anna Howard Jr HS | 1266 |
| Shoemaker, Wm. H. Jr HS | 1217 |
| Strawberry Mansion Jr HS | 2237 |

| Name | # of Black Students |
|---|---|
| Sulzberger Mayer Jr HS | 1418 |
| Vaux Roberts Jr HS | 1426 |
| Wagner Gen. Louis Jr HS | 1237 |
| Freedman Samson L MS | 122 |
| Leeds Morris E. MS | 1565 |
| Lewis Ada H MS | 1559 |
| Pickett Clarence E. MS | 1185 |
| Rhodes E. Wash. MS | 1504 |
| Roosevelt Theodore MS | 1351 |
| Alcorn James El | 606 |
| Anderson Add B El | 816 |
| Arthur Chester A El | 346 |
| Barry Com John El | 789 |
| Belmont El | 769 |
| Benson Gustavus S El | 208 |
| Blaine James G El | 744 |
| Blankenburg Rudolph | 539 |
| Bryant Wm Cullen El | 830 |
| Carver Geo Wash El | 706 |
| Childs George W El | 644 |
| Cleveland Grover El | 815 |
| Clymer Geo El | 825 |
| Comegys Benjamin B El | 953 |
| Daroff Samuel H El | 774 |
| Day Anna Blakiston El | 559 |
| Dick William El | 938 |
| Douglass Frederick El | 759 |
| Drew Charles R El | 371 |
| Duckrey Tanner | 761 |
| Dunlap Thomas | 460 |
| East Falls El | 228 |
| Edmonds Franklin S El | 1175 |
| Elverson James Jr El | 601 |
| Emlen Eleanor Cope El | 744 |
| Fulton Robert El | 536 |
| Gideon Edward | 488 |

| Name | # of Black Students |
|---|---|
| Gompers Samuel | 720 |
| Hamilton Andrew | 923 |
| Hanna William B El | 815 |
| Harrington Avery D El | 841 |
| Harrison Wm. Henry El | 364 |
| Harrity William F El | 581 |
| Hawthorne Nathaniel | 328 |
| Heston Edward | 804 |
| Hill Leslie Pinkney El | 857 |
| Holmes Oliver Wendell | 549 |
| Howe Julia Ward | 618 |
| Huey Samuel B | 1003 |
| Kelley William D El | 694 |
| Kelly John B El | 1005 |
| Kenderton El | 881 |
| Kinsey John L | 803 |
| Landreth David El | 391 |
| Lehigh El | 721 |
| Leidy Joseph El | 533 |
| Locke Alaine El | 696 |
| Logan El | 510 |
| Longstreth Wm C El | 1028 |
| Mann William B El | 836 |
| McCloskey John F El | 581 |
| McDaniel Delaplaine | 760 |
| McMichael Morton El | 900 |
| Meade Gen George C El | 910 |
| Mitchell S. Weir El | 1039 |
| Morris Robert El | 710 |
| Overbrook Elementary | 388 |
| Pastorius Francis D El | 961 |
| Peirce Thomas May El | 838 |
| Pennell Joseph | 682 |
| Pennypacker Sam. W El | 1210 |
| Pratt Arnold El | 911 |
| Prince Hall El | 891 |

| Name | # of Black Students |
|------|---------------------|
| Reynolds Gen. John F El | 810 |
| Rhoads James | 629 |
| Rowen William El | 1220 |
| Sarian John El | 448 |
| Smith Walter Geo El | 456 |
| Spring Garden El | 527 |
| Stanton Edwin M El | 361 |
| Stanton M Hall | 895 |
| Steel Edward T El | 964 |
| Walton Rudolph S El | 764 |
| Washington Martha El | 830 |
| Whittier John Greenleaf | 950 |
| Wilson Alexander El | 418 |
| Wister John El | 744 |
| Wister Mary Channing El | 406 |
| Wright Richard R El | 532 |
| Catto Octavius Spec | 181 |
| Kane Elisha Kent | 299 |
| Miller E Spencer Spec | 319 |
| Phila Youth Dev Day Tr | 230 |
| Youth Development Ctr Spec | 166 |
| | 107,619 |
| Total Blacks= | 155,706 |

Percentage of Black Students In Schools with greater then 90% Black population= 69%

## TABLE II

## SCHOOLS WITH GREATER THAN 90% BLACK POPULATION AS OF 10/31/1980

| Name | # of Black Students |
|---|---|
| Franklin HS | 1948 |
| Germantown HS | 2908 |
| Germantown M6 | 169 |
| Gratz HS | 2630 |
| King HS | 3161 |
| Overbrook HS | 3250 |
| Penn HS | 1890 |
| Strawberry JRH | 1954 |
| U City HS | 2306 |
| W Phila HS | 2730 |
| Box HS | 1421 |
| Dobbins | 2197 |
| Audenreid Jr H | 530 |
| Barratt Jr H | 769 |
| Beeber Jr H | 1063 |
| Fitzsimmons Jr H | 1338 |
| Gillespie Ed Jr H | 1251 |
| Sayre WL Jr H | 1244 |
| Shaw A H Jr H | 994 |
| Shoemaker Jr H | 1030 |
| Sulzberger M Hr H | 1097 |
| Vaux R Jr H | 1071 |
| Wagner G L Jr H | 1034 |
| Freedman S L MS | 81 |
| Leeds M E MS | 1193 |
| Lewis A H MS | 1457 |
| Pickett C E MS | 1024 |
| Rhodes E W MS | 1214 |
| Roosevelt T Jr H | 908 |
| Tilden W T MS | 792 |
| Alcorn J ES | 439 |
| Anderson A D ES | 735 |

| Name | # of Black Students |
|---|---|
| Arthur C A ES | 324 |
| Barry C J ES | 670 |
| Bartlett C. E ES | 361 |
| Belmont ES | 702 |
| Blaine J G ES | 608 |
| Blankenburg R ES | 477 |
| Bryant W C. ES | 730 |
| Carver G W ES | 560 |
| Childs G W ES | 555 |
| Cleveland G ES | 783 |
| Clymer G ES | 679 |
| Comegys B B ES | 762 |
| Daroff S ES | 561 |
| Day A B ES | 383 |
| Dick W ES | 623 |
| Douglass F ES | 630 |
| Duckrey T ES | 691 |
| Dunlop T ES | 346 |
| Durham TCDC | 235 |
| Edmonds F S ES | 921 |
| Emlen E C ES | 803 |
| Fulton R ES | 476 |
| Gideon E ES | 359 |
| Gompers S ES | 594 |
| Hamilton A ES | 948 |
| Hanna W B ES | 724 |
| Harrington A D ES | 859 |
| Harrison W H ES | 272 |
| Harrity W P ES | 426 |
| Heston E ES | 679 |
| Hill L P ES | 535 |
| Holmes O W ES | 475 |
| Howe J W ES | 604 |
| Huey S B ES | 816 |
| Kearney G P ES | 401 |
| Kelley W D ES | 610 |

| Name | # of Black Students |
|---|---|
| Kelly J B ES | 898 |
| Kenderton ES | 600 |
| Kinsey J L ES | 706 |
| Lehigh ES | 638 |
| Leidy ES | 400 |
| Lingelbach A L ES | 339 |
| Looke A ES | 561 |
| Logan | 747 |
| Longstreth W C ES | 1095 |
| Mann W B ES | 572 |
| McCloskey J B ES | 437 |
| McDaniel E ES | 636 |
| McMichael M ES | 740 |
| Meade G G C ES | 679 |
| Mitchell S W ES | 1020 |
| Morris R ES | 530 |
| Overbrook ES | 283 |
| Pastorius F P ES | 841 |
| Pierce T M ES | 714 |
| Pierce W S ES | 353 |
| Pennell J ES | 529 |
| Pennypacker S ES | 905 |
| Pratt A B ES | 653 |
| Prince Hall ES | 724 |
| Reynolds G J F ES | 658 |
| Rhoads ES | 534 |
| Rowen W ES | 1070 |
| Sartain J ES | 379 |
| Smith W G ES | 554 |
| Spring Garden ES | 490 |
| Stanton E M ES | 338 |
| Stanton M H ES | 672 |
| Steel E ES | 980 |
| Walton R S ES | 674 |
| Washington M ES | 773 |
| Whittier J G ES | 787 |

| Name | # of Black Students |
|---|---|
| Wilson A ES | 358 |
| Wister J ES | 691 |
| Wister M C ES | 366 |
| Wright R R ES | 453 |
| Cation O V SS | 188 |
| Kane E K SS | 242 |
| Miller E S SS | 180 |
| | 92,997 |
| Total Blacks | 140,432 |

Percentage of Black Students in Schools with greater than 90% Black populations=     66%