J. Howard Brandt, Incorporated, Delores Brandt and J. Howard Brandt, Appellants, *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission, Appellee.

124

Argued January 7, 1974, before President Judge BOWMAN and Judges KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. Judge CRUMLISH, JR. did not participate. Reargued June 5, 1974, before President Judge BOWMAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*James S. Kilpatrick, Jr.*, with him *Haws & Burke*, for appellants.

*Frank Finch, III*, Assistant General Counsel, with him *Sanford Kahn*, General Counsel, for appellee.

OPINION BY JUDGE KRAMER, August 20, 1974:

This is an appeal filed by J. Howard Brandt, Incorporated, Delores Brandt and J. Howard Brandt (hereinafter referred to collectively as Brandt) from a final order of the Pennsylvania Human Relations Commission (Commission) dated June 20, 1973. The Commission concluded that Brandt had committed an unlawful discriminatory practice in violation of Section 5(h)(1) of the Pennsylvania Human Relations Act (hereinafter Act), Act of October 27, 1955, P. L. 744, *as amended*, 43 P.S. §955(h)(1).

This case had its beginning when in February 1972 the Commission sent out employees called "testers" into an area of eastern Pennsylvania known as the Main Line. Testers are used by the Commission to seek information concerning available rental properties and to determine if real estate brokers are violating the Act. Testers are sent out in teams of two employees, one being of the white race, and the other of the black race. The white tester first enters a real estate broker's office, and under a pre-arranged format, presents himself as a prospective tenant to the broker

or a person in his office. After the broker or the person in charge of the office responds to the inquiry on whether or not an apartment or house is available for rental, the white tester leaves the premises and immediately informs his team member of the statements made in the broker's office. Within a few minutes, the black tester enters the same office and makes a similar inquiry on the availability of rental properties, and after receiving a reply, likewise retires to compare notes with the first tester. From the many cases which this Court has reviewed involving testers, it is apparent that the procedure thereafter is to make a determination on whether to file a complaint against the broker and others for violation of the Act. Sections 7 and 9 of the Act, 43 P.S. §§957 and 959, give the Commission the power to investigate and initiate complaints charging unlawful discriminatory practices, and we specifically hold that the use of testers is a permissible method under the statute to assist the Commission in making a determination on whether a complaint should be filed. The issue of entrapment raised by Brandt has no merit. Having initially upheld the use of testers, we now turn to the facts of this case.

On February 3, 1972, Gerard Rugel (Rugel), who is a white male employee of the Commission, entered the Brandt office seeking information about available rental property. He spoke to a young, tall man with brown hair, whose name he did not ascertain. Rugel asked for "one or two-bedroom apartments or houses" and did not request any specific area. He was offered "at Penn Wynne, a three-bedroom house" for a rental of $300 per month and was told that nothing else was available. According to Rugel, the entire transaction took "approximately five minutes or so, ten minutes, I'm not sure of the exact time." It was stipulated for the record that Rugel was not a bona fide prospective

tenant and that he was in the Brandt office for the purpose of testing. During his short visit to Brandt's office, Rugel saw no one other than the young man to whom he spoke.

After Rugel left Brandt's office, he immediately informed Margaret Mitchell (Mitchell), who was seated in an automobile parked nearby, of what had transpired. Mitchell is a female black employee of the Commission. Approximately ten minutes after Rugel left Brandt's office, Mitchell entered the same office (approximately 12 feet by 20 feet in size) and spoke to Delores Brandt. Mitchell did not see any other person in the office. Mitchell represented that her husband was "doing a residency at Lankenau Hospital" and that she would be "interested in a one, two, or three-bedroom apartment or a house in the general vicinity of Lankenau Hospital," for which she was willing to pay a rental "between $125 and $375." Mitchell testified that Mrs. Brandt said that she was sorry there was nothing available, and that she would take Mitchell's name and phone number and get in touch with her as soon as possible, when something was available. The whole operation of both testers was completed in about 25 minutes.

Thereafter, on April 28, 1972, a complaint was signed by the Executive Director of the Commission charging Brandt with a violation of the Act which took place on or about February 3, 1972 "concerning a three-bedroom property in *Pennway,* Pennsylvania." (Emphasis added.) It should be noted here that there is nothing in the record of the case submitted to this Court which could be deemed to be proof of service of the complaint or a copy thereof upon Brandt, and none was offered at the hearing. During the cross-examination of Rugel, it was developed that at some time during June of 1972 (the exact date is not disclosed anywhere) Rugel returned to the Brandt office for the

purpose of serving the complaint or a consent order. The record indicates that although the alleged incident occurred on February 3, 1972, the first time Brandt was given any knowledge of an investigation or charge was at the June 1972 confrontation. The matter came on for hearing on December 28, 1972, before three commissioners of the Commission. At this hearing, Rugel was unable to identify the young man with whom he spoke, either by name or by other identification, until after a former salesman of Brandt's was called to testify on behalf of the respondents. After the salesman's testimony, at the request and call of the Chairman of the Commission, Rugel was permitted to identify the salesman as the person with whom he spoke on February 3, 1972. The record indicates that this salesman was present in the hearing room during the entire proceedings.

The respondents and all of their employees testified that they had no recollection of either Rugel or Mitchell coming to the office on February 3, 1972, and that none of them had ever seen either of the two Commission testers prior to June of 1972, when Rugel appeared at the office.

There is evidence in the record which would support the Commission's eighth finding of fact which reads: "8. J. Howard Brandt, Inc. lists all available rentals on a paper attached to a clipboard which is on top of a filing cabinet in their office. All employees of J. Howard Brandt, Inc. have knowledge of and access to this clipboard so that if any rentals were available, each employee would be aware of them, or know where to find the information." However, there is nothing in this record which would indicate that the young man with whom Rugel spoke or Mrs. Brandt ever referred to a clipboard. There is also no evidence that in fact rental housing was available in the Brandt office, that either of the testers asked to see the clip-

board or any other list of available rentals, that Rugel ever asked to see the rental property he stated was proferred as available, or that the actions of any person in the Brandt office disclosed any outward appearance of discrimination toward Mitchell. The Commission's entire case rested upon the scant testimony noted above. The Commission offered no proof whatsoever concerning any "Three bedroom property in *Pennway,* Pennsylvania." (Emphasis added.)

Brandt was charged with, and held to be in violation of Section 5(h)(1) of the Act, which provides:

"It shall be an unlawful discriminatory practice . . .

. . . .

"(h)   for any person to:

"(1)   refuse to sell, lease, finance or otherwise to deny or withhold commercial housing from any person because of the race, color, religious creed, ancestry, sex or national origin of any prospective owner, occupant or user of such commercial housing, or to refuse to lease commercial housing to any person due to use of a guide dog because of the blindness of the user."

Our review is limited to a determination of whether the Commission's adjudication is in accordance with law and whether any finding of fact made in support of its adjudication is not sustained by substantial evidence. *Wilkinsburg School District v. Human Relations Commission,* 6 Pa. Commonwealth Ct. 378, 295 A. 2d 609 (1972). "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *A. P. Weaver & Sons v. Sanitary Water Board,* 3 Pa. Commonwealth Ct. 499, 284 A. 2d 515 (1971).

In recent cases we have recognized that the Act (Section 5(h)(1)) was intended to prohibit the withholding of information on available housing because of race, color, etc. *See Tomlinson Agency v. Pennsylvania Human Relations Commission,* 11 Pa. Commonwealth

Ct. 227, 312 A. 2d 118 (1973). It is clear to us that the primary legislative intent was to proscribe unlawful discriminatory practices as defined in the Act. The term "prospective owner, occupant or user" in Section 5(h)(1) of the Act must be interpreted to mean prospective in the eyes of the beholder, i.e., the real estate broker or salesman. It is conceivable upon a properly proven set of circumstances that there could be a violation of the Act even if factually there was no commercial housing available, and the prospect was a tester. A real estate broker or salesman violates the Act if, because of a person's race, etc., he intends to deny or withhold information from any person who presents himself to the broker as a "prospective owner, occupant or user."

Brandt also presented an issue to this Court concerning the testimony of Raymond W. Cartwright, the Commissioner's housing director, who testified to the general testing procedures and state-wide results thereof. We agree that most of Mr. Cartwright's testimony was irrelevant, but we likewise recognize that the Commission did not utilize any of his testimony in making its findings or conclusions. Therefore, we would not reverse the Commission on that issue alone. In passing, however, we note that Mr. Cartwright quite frankly stated for the record that the standard consent order which the Commission uses to conciliate this kind of case is designed to correct "errors that have the appearance of discrimination" as well as "blatant discriminatory acts." This admission acknowledges that some of these cases involve errors which, unfortunately, result in discrimination without any intent to discriminate.

The main issue presented by Brandt is whether there is substantial evidence to support the Commission's adjudication. We have read and reread the short record in this case, and hold that there is not substantial evidence in the record to support the Com-

mission's conclusion that "the Respondent committed an unlawful discirminatory [sic] practice in violation of Section 5(h)(1) of the Act by providing information concerning a house for rent at *Penn Wynne* to Mr. Rugel, a White male, and not providing the same information to Ms. Mitchell, a Black female." (Emphasis added.)

First of all the complaint alleges the violation to concern a "Three bedroom property at Pennway, Pennsylvania." No attempt was made at the hearing or at any time to amend the complaint to "Penn Wynne." During the past year, this Court has been forced to reverse the Commission in several cases, because the evidence presented was inconclusive. The problem in those cases, as well as in this case, was that the Commission's testers did not gather sufficient pertinent evidence to support the allegations and charges. These cases cannot be decided by what may be in the minds of the testers, the complainant, or even the Commission; but rather must be decided upon substantial evidence sufficient to support the complaint, and the findings and conclusions of the adjudication. These cases cannot be decided upon suspicion of discrimination. If the Commission's general conclusions are correct in these cases, that is, that unlawful discrimination existed, then it is distressing that the Commission's orders are reversed because of a lack of proper procedure or of proper preparation and presentation of evidence. It is even more distressing when improper procedures and inadequate presentations continue in case after case despite the pronouncements of this Court. *See Tomlinson, supra; St. Andrews Development Co., Inc. v. Pennsylvania Human Relations Commission,* 10 Pa. Commonwealth Ct. 123, 308 A. 2d 623 (1973); *Straw v. Pennsylvania Human Relations Commission,* 10 Pa. Commonwealth Ct. 99, 308 A. 2d 619 (1973). This Court has no supervisory powers over

the administration of regulatory agencies. Our task is to review the record, including the adjudication, and to interpret the law. When the record made fails to support the adjudication, then our duty is to reverse.

The Commission's approach to this type of case is somewhat simplistic. The Commission argues that it can meet its burden of proof by merely showing that two testers received different information, and that after such a showing the burden shifts to the respondents who must prove that the differing information did not amount to discrimination. If the respondents fail to carry their alleged burden of proof, then the Commission contends that it may conclude that they are in violation of the Act. We must conclude that the Commission's approach is improper. The burden is upon the Commission to prove through substantial evidence a violation of the Act. Even if a respondent takes the risky tactic of presenting no evidence whatsoever, the Commission cannot utilize that failure to present any evidence as the basis for determining a violation. In such a case, the Commission's case in chief must prove the violation, or otherwise it has not met its burden, and the complaint must be dismissed.

Although our review of this record would permit us to be suspicious that there may have been a discriminatory act performed by the people in the Brandt office on February 3, 1972, we must conclude that the Commission did not meet its burden of proof. Under the facts of this case discrimination is only one of several possible explanations for the different information received by the testers from two different individuals in the Brandt office. The Commission cannot meet its burden by showing that a violation of the Act *may* have taken place.

In closing, we feel constrained to mention that we do not condone the Commission's tactic of confronting a respondent many months after the alleged violation.

Considering the four-month delay in this case between the alleged violation and notice to Brandt, it is not surprising that all of Brandt's employees denied any knowledge or memory of the testers' visit on February 3, 1972, and considering the almost ten-month lag between the alleged violation and the hearing, it is not surprising that Rugel was initially unable to identify the salesman to whom he spoke. Obviously, prompt notice and prompt hearings for persons charged with violating the Act would be of benefit to everyone concerned, including this Court.

Since we have held that the Commission has failed to meet its burden, we enter the following

ORDER

AND NOW, this 20th day of August, 1974, the order of the Pennsylvania Human Relations Commission, dated June 20, 1973, pertaining to J. Howard Brandt, Incorporated, Delores Brandt, President, and J. Howard Brandt, Secretary-Treasurer, is hereby reversed.

---

CONCURRING OPINION BY JUDGE MENCER:

I concur with the majority that the Pennsylvania Human Relations Commission (Commission) has failed to produce sufficient evidence in this record to meet its burden of proof. However, I am of the opinion that it did not even attempt to prove two of the necessary elements of the alleged violation.

In *Tomlinson Agency v. Pennsylvania Human Relations Commission,* 11 Pa. Commonwealth Ct. 227, 312 A. 2d 118 (1973), we held that the failure to advise a black person of the availability for rental of a one-level frame house was not, without additional supportive evidence, sufficient to sustain a finding by the Commission that a real estate rental agency had committed an affirmative act of discrimination.

Acknowledging the need for the Commission and its dedication to the elimination of discrimination in housing, we are nevertheless faced with individual cases wherein the Commission has the duty to prove by a preponderance of the evidence that the respondents have violated the Pennsylvania Human Relations Act, Act of October 27, 1955, P. L. 744, as amended (Act), 43 P.S. §951 et seq.

Here, as in *Tomlinson*, the Commission contends that, once it has presented evidence that the respondent failed to inform a black tester[1] of the availability of an apartment and that there was no difference in the manner of inquiry by the white and black testers, it then becomes the obligation of the respondent to prove that an affirmative act of discrimination has not occurred. I view the Commission to be the party who has the burden of proving facts that will establish that the respondent has violated the Act's provisions. Such a burden of proof does not shift nor does the respondent have the duty to prove that he has not violated the provisions of the Act.

We must carefully consider the factual situation that led to this appeal from an adjudication of the Commission which held that J. Howard Brandt, Incorporated, Delores Brandt, President, and J. Howard Brandt, Secretary-Treasurer (respondents), had committed an unlawful discriminatory practice in violation of Section 5(h) of the Act, 43 P.S. §955(h).

On February 3, 1972, Gerard Rugel, who is white, and Margaret Mitchell, who is black, both employes of the Commission, alternately entered the office of the respondents, seeking information about available rental property. Mr. Rugel made the initial inquiry and

---

[1] Two employes of the Commission, one white and the other black, alternately enter rental agencies to determine, or test, whether like information is afforded white and minority applicants.

"asked for one or two bedroom apartments or houses." He testified that he "didn't give any specific area" and was offered "at the Penn Wynne, a three bedroom house" for a rental price of $300 per month. Mr. Rugel spoke to and received this information from a "young man, rather tall, [with] brown hair."

Mr. Rugel then left respondents' office and immediately informed Margaret Mitchell, who was seated in an automobile parked nearby, of what had happened and what he had been told. Approximately ten minutes thereafter Margaret Mitchell entered the office of the respondents and spoke to Delores Brandt. Mrs. Mitchell falsely told Mrs. Brandt that her husband was doing a "residency at Lankenau Hospital and we would be interested in an apartment, one, two, three bedroom apartment" or "a house in the general vicinity of Lankenau Hospital." Mrs. Mitchell further testified that "she [Mrs. Brandt] was sorry there was nothing available and that she would take my name and phone number and get in touch with me as soon as possible, when something was available. I thanked her and left."

There was also evidence in the record that would support the Commission's eighth finding of fact which reads: "8. J. Howard Brandt Inc. lists all available rentals on a paper attached to a clipboard which is on top of a filing cabinet in their office. All employees of J. Howard Brandt Inc. have knowledge of and access to this clipboard so that if any rentals were available, each employee would be aware of them, or know where to find the information."

The respondents and all of their employees testified that they had no recollection of Mr. Rugel's and Mrs. Mitchell's coming to the office of the respondents on February 3, 1972 and that, in fact, none of them had even seen these two Commission testers prior to June of 1972 when Mr. Rugel came to the office to discuss the events of February 3, 1972 with respondents.

Here respondents were charged with and held to be in violation of Section 5(h)(1) of the Act, 43 P.S. §955(h)(1), which provides:

"It shall be an unlawful discriminatory practice . . . :

. . . .

"(h)  For any person to:

"(1)  Refuse to sell, lease, finance or otherwise to deny or withhold commercial housing from any person because of the race, color, religious creed, ancestry, sex or national origin of any prospective owner, occupant or user of such commercial housing, or to refuse to lease commercial housing to any person due to use of a guide dog because of the blindness of the user."

In *Tomlinson Agency v. Pennsylvania Human Relations Commission, supra,* we recognized that this legislation was intended to prohibit the withholding of information on housing availability because of race and/or color. The withholding of such information is "to deny or withhold" under the provisions of Section 5(h)(1) of the Act. However, it is my view that for a violation of Section 5(h)(1) of the Act to be established, the Commission must prove four elements by a preponderance of the evidence. These four essential elements are that (1) commercial housing was available and (2) denied to a person (3) because of the race, color, religious creed, ancestry, sex or national origin of, or use of a guide dog because of blindness by, (4) any prospective owner, occupant or user of such commercial housing.

Here the record is completely void of any evidence as to the first element. It is unknown and impossible to determine from the record before us whether or not, at the time Margaret Mitchell inquired of respondents, there was any commercial housing available for renting.[2]

------

[2] The Commission made a part of its sixth finding of fact that Mrs. Brandt informed Margaret Mitchell that there was

Likewise, of significance and importance here, all the evidence establishes that, as to the fourth element, Mr. Rugel and Mrs. Mitchell were not prospective owners, occupants or users of a three-bedroom house at Penn Wynne but were admittedly testers of the Commission, not interested in renting from the respondents but solely seeking evidence of unlawful discriminatory practices.

The Commission's testing program has an immediate appeal since it is likely that those persons actually seeking commercial housing would be dealt with in the same manner as the Commission's testers. In addition, the task of proving discrimination is often a formidable one, more dependent on circumstantial evidence than direct and positive evidence. However, as to violations of Section 5(h)(1) of the Act, the usual sequence would be that of (1) a prospective user of available commercial housing who is improperly denied (2) making his denial known to the Commission, (3) followed by an investigation and the accumulation of evidence (4) to support the filing of a complaint[3] and (5) a hearing at which the four elements that make up the violation under Section 5(h)(1) of

---

nothing available for rent at that time. However, there is nothing in the record to establish the falsehood of such a statement. It is the *fact of availability at that time*, not an *assertion of availability at an earlier time* to someone other than Mrs. Mitchell, that must be established. *See Elgart v. Pennsylvania Human Relations Commission*, 4 Pa. Commonwealth Ct. 616, 287 A. 2d 887 (1972).

[3] Section 7(f) of the Act, 43 P.S. §957(f), specifically provides the Commission with the power "[t]o initiate . . . complaints charging unlawful discriminatory practices." This power given to the Commission does not eliminate the need to establish all elements of the alleged violation by a preponderance of the evidence at a hearing. The initiating of complaints by the Commission for a violation of Section 5(h)(1) of the Act clearly is predicated on a factual determination that a prospective user was improperly denied commercial housing.

the Act would be established by a preponderance of the evidence.[4]

The Commission's simplistic approach—merely showing that two testers received different information, concluding that it then becomes the respondents' burden to prove that an affirmative act of discrimination has not occurred, and, upon failure of the respondents to carry such a burden, making an adjudication that it conclusively follows that respondents have committed a violation of the Act in regard to an unlawful discriminatory practice—is not, in my view, legally sufficient. Such an adjudication is not supported by substantial evidence.

What we said in *Tomlinson* is apropos here: "We are aware of the Commission's proper objectives in eagerly pursuing those who practice discrimination through the subtle means of withholding information on available housing from prospective minority tenants. But it is our duty in reviewing the evidence to carefully examine it lest the Commission's zeal results in legally unfounded inferences and conclusions, to the pain and sacrifice of those so accused." 11 Pa. Commonwealth Ct. at 231, 312 A. 2d at 120-21.

I can only conclude that, although the Commission's motives here were indeed high ones, the evidence in this record will support neither the necessary findings of a discriminatory practice basic to the charge of the complaint nor the ultimate conclusion of a violation of the Act.[5]

---

[4] See Section 9 of the Act, 43 P.S. §959, for procedure.

[5] *Accord, St. Andrews Development Co. Inc. v. Pennsylvania Human Relations Commission*, 10 Pa. Commonwealth Ct. 123, 308 A. 2d 623 (1973) ; *Marhoefer v. Human Relations Commission*, 4 Pa. Commonwealth Ct. 242, 285 A. 2d 547 (1971) ; *Pennsylvania Human Relations Commission v. Altman*, 87 Dauph. 227, 42 Pa. D. & C. 2d 317 (1967).

CONCURRING OPINION BY JUDGE CRUMLISH, JR.:

Although I agree with the reasoning and result reached by the majority, I feel constrained to further delineate what I consider to be the appropriate limitations on the use of testers by the Pennsylvania Human Relations Commission. If the majority were consistent with its express holding "that the use of testers is a permissible method under the statute to assist the Commission in making a determination on whether a complaint should be filed," I would have no difficulty with its reasoning. By suggesting that a violation of the Act could in a future hypothetical be established by the testimony of testers alone, however, subscribes a latitude to their use which, in my opinion, was expressly negated by the Legislature in enacting section 5(h)(1) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P. L. 744, *as amended,* 43 P.S. §955(h)(1).

The *sine qua non* of the Commission's assertion of its authority over such persons as the Brandts is the allegation and subsequent finding of an "unlawful discriminatory practice" defined by Section 5(h)(1) as the "(r)efusal to sell, lease, finance or otherwise to deny or withhold commercial housing from any person because of the race, color, religious creed, ancestry, sex or national origin of *any prospective owner, occupant or user* of such commercial housing. . . ." (43 P.S. §955(h)(1), emphasis supplied.) To me it is clear that the legislature intended an unlawful discriminatory practice to occur after a *prospective* owner, occupant or user has been denied commercial housing or the financing or information necessary thereto. *Tomlinson Agency v. Pennsylvania Human Relations Commission,* 11 Pa. Commonwealth Ct. 227, 312 A. 2d 118 (1973). As the testers here admittedly had no bona fide intention of buying or leasing commercial housing, they were

not "prospective" owners, occupants or users, and therefore their experiences with the Brandts cannot form the basis for initiating a complaint. The Commission's recognized power under Sections 7 and 9 of the Act, 43 P.S. §§957 and 959, to investigate and initiate complaints is, nevertheless, contingent upon the occurrence of an unlawful discriminatory practice which cannot be sustained by the experience of testers who are not prospective users of the housing opportunities allegedly denied.

What then is the appropriate role of testers in proving elusive acts of discrimination? The case law dealing with Section 804(a) of the Federal Fair Housing Act of 1968, Titles VIII and IX of the 1968 Civil Rights Act, 82 Stat. 73, 81-90, 42 U.S.C. §3604(a), provides some guidance to this inquiry. 42 U.S.C. §3604(a) makes it unlawful "to refuse to sell or rent, *after the making of a bona fide offer,* or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling . . . to any person because of race, color, religion or national origin." (Emphasis supplied.) Construing the requirement of a "bona fide offer," the courts have consistently held that the denial of housing information to testers cannot form the basis of a complaint, but may be used to corroborate a complaint of discrimination by a person who has made a bona fide offer. *See, e.g., Williamson v. Hampton Management Co.,* 339 F. Supp. 1146 (N.D. Ill. 1972); *Brown v. Ballas,* 331 F. Supp. 1033 (N.D. Tex. 1971); *Bush v. Kaim,* 297 F. Supp. 151 (N.D. Ohio 1969); *Newbern v. Lake Lorelei,* 308 F. Supp. 407 (S.D. Ohio 1968). For example, after a minority complainant has made a bona fide offer to purchase or rent which has been denied for what that person believes to be discriminatory reasons, the Commission can send out non-minority testers to determine standards and patterns by which *the com-*

*plainant's* experience can be realistically compared. *See, e.g., Martin v. Bowers,* 334 F. Supp. 5 (N.D. Ill. 1971).

It is this corroborative value of testers which this writer intended to suggest in *Tomlinson Agency v. Pennsylvania Human Relations Commission, supra.* We held in *Tomlinson* that the mere discrepancy in housing information given to two testers was, standing alone, insufficient to support a violation of Section 5(h)(1). As was there stated: "A case based on patterns, responses to questions and the testimony of additional witnesses may have and probably would have supported the Commission testers' suspicions. As the record stands now, the Commission would have us agree that any omission on its face is substantial evidence of discrimination." 11 Pa. Commonwealth Ct. at 231, 312 A. 2d at 121.

In short, I would recognize the testimony of testers as probative and *corroborative* of evidence by a "prospective owner, occupant or user of commercial housing" that that person was discriminatorily denied such housing. But standing alone, the testimony of a tester cannot establish an "unlawful discriminatory practice."

---

DISSENTING OPINION BY JUDGE ROGERS:

I dissent because I believe there is in this record substantial evidence supporting the Commission's findings and its conclusion. Sex and color were the only differences between the testers. The inference drawn by the Commission that the testers were given different information based upon one or the other of these differences between them as persons was not unfair.