Vacated and remanded. Jurisdiction relinquished.

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Petitioner,**

v.

**SCHOOL DISTRICT OF PHILADELPHIA,**
**Respondent**

and

**Harry and Annemarie Gwynne, ASPIRA of Pennsylvania, et al., Intervenors.**

Commonwealth Court of Pennsylvania.

Decided June 4, 1993.

Publication Ordered Nov. 28, 1994.

---

1. S.S. shall remain in foster care pending the   trial court's decision on remand.

Elisabeth S. Shuster, Chief Counsel, and Michael Hardiman, Asst. Chief Counsel, for petitioner.

William H. Brown, III, and Christina Rainville, for respondent.

Michael Churchill, Richard Z. Freemann, Jr., and Daniel W. Cantu–Hertzler, for intervenors.

SMITH, Judge.

Without exhaustively reciting the decades-long procedural history of the Philadelphia public school desegregation case culminating in the current appeal to the Pennsylvania Supreme Court,[1] this Opinion will address this Court's April 14, 1993 order which granted motions for directed verdict on the issue of mandatory busing for school desegregation purposes and denied motions to join, in these proceedings, as indispensable and necessary parties the Commonwealth of Pennsylvania, the Governor of Pennsylvania, the Department of Education, and certain contiguous suburban school districts (Upper Darby, Interboro, Haverford, Lower Merion, Abing-

1. See, Pennsylvania Human Relations Commission v. School District of Philadelphia, 66 Pa.Commonwealth Ct. 154, 443 A.2d 1343 (1982); Pennsylvania Human Relations Commission v. School District of Philadelphia, 30 Pa.Commonwealth Ct. 644, 374 A.2d 1014 (1977), aff'd, 480 Pa. 398, 390 A.2d 1238 (1978); Pennsylvania Human Relations Commission v. School District of Philadelphia, 23 Pa.Commonwealth Ct. 312, 352 A.2d 200 (1976), aff'd, 480 Pa. 398, 390 A.2d 1238 (1978); Philadelphia School District v. Human Relations Commission, 6 Pa.Commonwealth Ct. 281, 294 A.2d 410 (1972), aff'd, 455 Pa. 52, 313 A.2d 156 (1973).

ton, Cheltenham, Colonial, Springfield, Lower Moreland, Bensalem and Neshaminy.)

## I.

On March 17, 1993, this Court commenced hearings on the issue of the compliance of Respondent, the School District of Philadelphia, with an April 15, 1982 order of this Court directing the District to:

modify its 1976 Voluntary Desegregation Plan to correct racial imbalance, as measured by the [Petitioner's] Pennsylvania Human Relations Commission's new (1979) definition of a segregated school, suggesting that in so doing serious consideration be given to the following:

(1) the pairing of elementary schools ...; and

(2) the reassignment of pupils affected by school closings in a fashion which will promote desegregation rather than perpetuate segregation.

Such modifications shall be submitted to the Pennsylvania Human Relations Commission on or before July 1, 1982.

*Pennsylvania Human Relations Commission v. School District of Philadelphia,* 66 Pa.Commonwealth Ct. 154, 180–81, 443 A.2d 1343, 1355 (1982). The hearings themselves evolved as follows.

On June 30, 1982, the District submitted a plan entitled "Proposal for Modification." The plan contained no mandatory desegregation measures. Rejecting the proposed modification, the Commission, the entity statutorily charged with alleviating school segregation,[2] returned to this Court for enforcement. Prior to any additional judicial intervention, however, the District submitted yet another plan referred to as the 1983 Modified Desegregation Plan which encompassed three components: educational improvement plan, desegregation expansion strategy, and reduction of racially isolated schools.

Despite Commission reservations as to the purely voluntary nature of the "modified plan," as it became known, and in an effort to avoid continued litigation, the Commission and the District executed a Memorandum of Understanding on October 24, 1983 pursuant to which the modified plan would be implemented for a three-year period. If, after three years, either party was not satisfied that the plan had achieved, in the words of the Memorandum, "maximum feasible desegregation," the matter would be referred to a Settlement Team appointed by the parties to independently evaluate progress toward achieving maximum feasible desegregation and report its findings to the Court and the parties.

For three years the District implemented the modified plan and submitted annual reports to the Commission. In June 1988, the Commission concluded that maximum feasible desegregation had not been achieved under the modified plan. On June 27, 1988, the Commission and the District entered into a joint stipulation acknowledging their inability to agree on the issue of accomplishing maximum feasible desegregation and invoking the creation of a Settlement Team.

In November, 1992, the Settlement Team completed its formal findings included among which was a recommendation for the pairing of several schools which would require mandatory reassignment per busing. Following completion of the Settlement Team Report, this Court entertained oral argument during which the District indicated its disagreement with the Report. The District responded that it had complied with this Court's April 15, 1982 order to the extent feasible.[3] This Court scheduled hearings and permitted interested parties to request intervention. Prior to commencement of the first evidentiary hearing on March 18, 1993, this Court entertained and granted intervention to the parties indicated below.

Intervention was granted to three sets of intervenors. They are: first, Olney–Oak Lane–Feltonville Parents for Better Schools, the Lowell Home and School Association and the Finletter Home and School Association which collectively represent families in the

---

2. *See* the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §§ 951–963.

3. Neither currently nor at any time during the pendency of this litigation has the Commission complained of *de jure* segregation by the District.

District who challenge the mandatory busing of students particularly as it regards school overcrowding implications; second, the Coalition of Concerned Citizens for Quality Education which represents parents and students opposed to mandatory busing measures as a method of desegregation; and third, ASPIRA of Pennsylvania, Citizens Committee on Public Education in Philadelphia, Fellowship Commission, Parents Union for Public Schools, Philadelphia Association of School Administrators, and the Philadelphia Home and School Council which in tandem represent parents, students and school administrators seeking to insure equal opportunities for quality education.

At the close of the fourth hearing held on April 8, 1993, the Commission rested its case whereupon both the District and Intervenor Coalition of Concerned Citizens for Quality Education moved for a directed verdict on the basis of, inter alia, the Commission's having failed to demonstrate that mandatory desegregation measures were feasible. This Court treated the motions as though for compulsory nonsuit in partially granting them by order dated April 14, 1993.[4] It is from this decision that the Commission has appealed. (In the interest of judicial economy, this Court certified its interlocutory order for immediate appeal to the Pennsylvania Supreme Court. *See* 42 Pa.C.S. § 702(b).)

### II.

A motion for directed verdict is properly posed at the close of all the evidence. *See* Pa.R.C.P. No. 226. This Court, however, will treat the motions as if they were for compulsory nonsuit. *See* Pa.R.C.P. No. 126. The legal standard for determining either is essentially the same and is one which is so familiar as to be formularistic.

A motion for a compulsory nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence. *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978). A judgment of nonsuit can be entered only in clear cases, and a plaintiff must be given the benefit of all evidence favorable to him,

together with all reasonable inferences of fact arising therefrom, and any conflict in the evidence must be resolved in the plaintiff's favor.

.     .     .     .     .

Rule 230.1 establishes several distinct elements to be met before a nonsuit may be granted. One is that the plaintiff's case on liability must be closed. Another is that nonsuit must be requested before any evidence on behalf of the defendant has been introduced. A third is that the plaintiff must have failed to establish a right to relief. *Robinson v. City of Philadelphia,* 149 Pa.Commonwealth Ct. 163, 167–68, 612 A.2d 630, 632–33 (1992). *See also Rizzo v. Michener,* 401 Pa.Superior Ct. 47, 584 A.2d 973 (1990), *appeal denied,* 528 Pa. 613, 596 A.2d 159 (1991). *Compare Thompson v. Maryland & Pennsylvania R.R. Preservation Society,* 417 Pa.Superior Ct. 216, 222, 612 A.2d 450, 453 (1992), *appeal denied,* 533 Pa. 635, 621 A.2d 581 (1993) ("In deciding a motion for a directed verdict, the trial court must consider the facts in the light most favorable to the party against whom the motion is made and must accept as true all evidence which supports that party's contention and must reject all adverse testimony.")

■ This Court has stated that it is the burden of the Commission to introduce "substantial evidence" in support of its position that the Pennsylvania Human Relations Act, 43 P.S. §§ 951–963, has been violated. *See J. Howard Brandt, Inc. v. Pennsylvania Human Relations Commission,* 15 Pa.Commonwealth Ct. 123, 324 A.2d 840 (1974). " 'Substantial evidence' means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 130, 324 A.2d at 843.

■ How heavy a burden, and by whom it is borne, is one never specifically articulated in the context of enforcement proceedings in school desegregation cases in this Commonwealth. The history of this litigation is not, however, without its instruction. In the first

---

**4.** This Court ruled that the evidence regarding other ameliorative measures, namely further voluntary desegregation methods and educational improvements, was sufficient to withstand the motions.

Opinion emanating from this Court, Judge Wilkinson wrote of a "record completely barren of testimony concerning ... whether there is any need for a change in the employment practices of the district." 6 Pa.Commonwealth Ct. at 290, 294 A.2d at 414. In like vein, this Court alluded to the burden of proof when it later wrote: "[T]he narrow issue presently before us is that of *whether the Commission's determination that there has been insufficient progress toward the desegregation of Philadelphia's public schools as the result of efforts pursuant to the 1976 Voluntary Plan is adequately supported by the evidence of record.*" 66 Pa.Commonwealth Ct. at 174–75, 443 A.2d at 1352 (emphasis added). Thus it is the Commission which logically and legally bears the burden of adducing evidence in support of its determinations as to the efficacy of a plan devised by the District and as to the curative measures needed.

### III.

■ Instantly the Commission bore the burden of demonstrating that the District had failed to achieve maximum feasible desegregation[5] and that this failure could be cured by means of, inter alia, mandatory busing. With respect to the use of mandatory desegregation measures, particularly busing, the Commission failed to carry its burden as manifested by the following evidentiary recapitulation.

Mr. Homer Floyd has been the Executive Director of the Commission since February 2, 1970. On direct examination he testified as to the modified plan and its tripartite components. In 1987 the Commission began its review of the plan in light of the common goal of reaching maximum feasible desegregation. The Commission ultimately concluded that the modified plan, which did not require reassignment or pairing,[6] had not met the goal; hence, the matter proceeded to the Settlement Team which in November, 1992 concurred in the Commission's conclusion. On cross-examination Mr. Floyd stated that although the Commission could have made suggestions as the District submitted its requisite annual progress reports, the Commission instead chose to inform the District of its noncompliance after the three-year implementation period.

The Commission took the position that neither kindergartners nor special education students should be reassigned,[7] and it also drew the mandatory busing line at 45 minutes from point of origin to point of destination. The Commission long ago accepted the fact that limits must be placed on the amount of time school children are required to travel to and from school. *See* 66 Pa.Commonwealth Ct. at 178, 443 A.2d at 1354. Mr. Floyd stated, however, that the Commission never discussed desegregation in the context of mandatory busing and, indeed, does not have a position with respect thereto.

> See, we don't have a position on busing. We've never taken—we have absolutely no position on busing one way or the other. Our position is on desegregation. And as a part of desegregation there is an arsenal of tools that you can use, whether it's pairing of schools, whether it's closure of schools or reassignment of changes, attendance boundary lines. There's magnet schools, there's satelliting. There's [sic] all those kinds of desegregation methods.

N.T. 3/18/93 at 210–11.

When asked whether the Commission had recommended pairings which would require

---

**5.** A Commission witness defined "maximum feasible desegregation" as: "[A] plan that would conform to the amended final order of the Commission, conforming to the recommended elements of the desegregation plan; and where there is nonconformity to those elements, persuasive and substantial justification as to why not." N.T. 3/19/93 at p. 240. While this Court recognizes that the District and the Commission adopted this standard pursuant to their Memorandum of Understanding, it nonetheless represents a legitimate, legal formulation of the District's duty in light of this Court's prior mandates, specifically its order of April 15, 1982.

*See e.g.,* 30 Pa.Commonwealth Ct. at 647, 374 A.2d at 1016 (school district to be permitted to implement plan it feels "will accomplish desegregation with a minimum of disruption and a maximum of educational value.").

**6.** Under the Commission definition, pairing is the mandatory reassignment of students. See N.T. 3/18/93 at p. 215.

**7.** In the case of special education students, reassignment could be mandated provided the special education services could be duplicated in the receiving school.

busing students from the far northeastern part of the City, the area of greatest white student concentration and isolation, to its center or western regions, Mr. Floyd replied:

> I think there's a better person to answer that question than I. It is my understanding as part of the discussions that took place between the School District, our staff, and the Settlement Team was [sic] a number of discussions about pairings. And there were some charts used and so forth.

> Those were not necessarily Commission-recommended pairings. They were proposals or ideas that were thrown out for discussion, most of which the School District rejected.

*Id.* at 219. Nonetheless he acknowledged that the Commission does not oppose the pairings which the Settlement Team proposed in its Report. Proceeding on the assumption that desegregation could be accomplished within existing budgetary constraints, the Commission concluded that maximum feasible desegregation had not been achieved on account of achievement test and desegregation data it did review.

Mr. Anliot, the only other witness for the Commission, stated that he had worked for the Commission for thirty-seven years. For thirty-five of those years he directed its Department of Education and Community Services. Through him the Commission introduced a number of Exhibits relating to desegregation and achievement test statistics. When questioned on cross-examination as to the proposed pairings, Mr. Anliot testified as follows:

> Q: Did you ever measure, you yourself, the distances between the schools that the recommendation has been to pair?
>
> A: Yes.
>
> Q: You did that yourself?
>
> A: Yes.
>
> Q: And which schools did you measure the distance between and when?

> A: It was the distance and the travel time between an elementary school in the Far Northeast and schools that were west of Broad Street?
>
> Q: Which school in the Northeast did you visit to measure the distance?
>
> A: I don't recall specifically now without—
>
> . . . .
>
> Q: But I would take it that other than that one time, that's the only time you actually measured some distances?
>
> A: Time of travel; yes.
>
> Q: That's right. And at no time in those 20 years of the history of this case did you ever measure the distance between a specific school and another school?
>
> A: Yes, I did; by the scale on the map of the School District.
>
> Q: But not by driving it?
>
> A: That's correct.

N.T. 4/8/93 at pp. 659, 664. Moreover, Mr. Anliot professed his belief in the "probability" that he could measure driving time by looking at a map which did not indicate stoplights, stop signs, detours or traffic volume. *Id.* at 743–44.

The Commission introduced 14 Exhibits, all of which were admitted into the record except Exhibits 5 and 8. Exhibits one through seven can be characterized as relevant to the history of this litigation and include, inter alia, the District's modified plan, Memorandum of Understanding, Joint Stipulation, and Report of the Settlement Team. Exhibits nine through fourteen reflect data compiled and analyzed by Mr. Anliot in his efforts to measure desegregation progress under the modified plan. None of the Exhibits purports to analyze the feasibility of scholastic pairings or their relationship to increased desegregation.[8]

As the Petitioner, the Commission was charged with demonstrating that the District's plan had not achieved maximum, or even feasible, desegregation. Feasible has

---

8. Exhibit 7 is the Report of the Settlement Team containing recommended pairings which would be mandatory and require busing the reassigned students. Although the Commission chose to rely on this Report as evidentiary support with respect to mandatory reassignment, this Court is not bound to accord it the evidentiary sufficiency thereby sought. In any event the Report does not purport to examine the feasibility of busing students between the paired schools.

been variously defined as: "Capable of being done, executed, affected or accomplished. Reasonable assurance of success. See Possible," Black's Law Dictionary 549 (5th ed. 1979); "[t]hat [which] may be done, performed, executed or effected; practicable; possible." Webster's New Twentieth Century Dictionary 669 (2d ed. 1978). Instantly the Commission proffered no evidence in support of the proposition that mandatory busing would effectuate further desegregation than has been accomplished under the modified plan, and it neither proved the feasibility of mandatory reassignment per busing nor any cause and effect relationship between busing, if indeed it were feasible, and increased desegregation. Under these circumstances, this Court was required to grant the respective motions as to this issue.

IV.

In addition to the appeal of the Commission there is one filed by the District which complains that this Court should have granted its motion to join the Commonwealth of Pennsylvania, the Governor of Pennsylvania, the Department of Education and contiguous suburban school districts as indispensable and necessary parties. The District also contends it was error not to have granted the District's motion for a directed verdict in its entirety.

a.

■ The District asserts that only a metropolitan school district, spanning the contiguous suburban school districts, would put an end to segregation within its boundaries which in actuality devolves from artificial, state-created districting. Moreover, the District argues, without the joinder of the Governor and the Department of Education, any resolution devised by these proceedings will be futile because the financial wherewithal will be lacking. This Court has been presented with both issues in prior phases of this litigation.

Writing for a unanimous Court in 1976, Judge Rogers rejected the District's earlier bid to compel the creation of a metropolitan school district for purposes of increasing the pool of white students available to desegregate its schools.

The District, of course, concedes that its proposal, which to our knowledge has been a subject of public discussion but without action for at least ten years, is beyond the District's power to implement and the Commission's power to order. *It is just as certainly beyond our power to compel and must be rejected.* State policy seems thus far to be that Philadelphia should single-handedly struggle with the State's statute mandating the integration of the public schools, whatever the difficulties.

*Pennsylvania Human Relations Commission v. School District of Philadelphia,* 23 Pa.Commonwealth Ct. 312, 327, 352 A.2d 200, 209 (1976), *aff'd,* 480 Pa. 398, 390 A.2d 1238 (1978) (emphasis added).

Likewise writing for a majority Court, Judge Wilkinson addressed the issue of financing a desegregation plan in 1972.

The Court is very sympathetic with the position of the School [District] that it is futile to require the districts to submit plans that would meet the minimum requirements of the Commission when the increased costs incident to such plans, i.e. busing, installation of cafeterias, lunch programs, etc., are beyond the financial capabilities of the Districts. However, the costs cannot be determined with any accuracy until a minimum acceptable plan is submitted. *Whether it can be implemented within the financial capabilities of the [District], together with such support from other sources as can be generated and with any realignment of priorities, will have to be determined at that time.*

*Philadelphia School District v. Human Relations Commission,* 6 Pa.Commonwealth Ct. 281, 287, 294 A.2d 410, 413 (1972), *aff'd,* 455 Pa. 52, 313 A.2d 156 (1973) (emphasis added). Together these prior pronouncements required a denial of the District's joinder requests under the doctrine of the law of the case meaning that "whatever is once irrevocably established as the controlling legal rule of decision between the same parties in the same case continues to be the law of the case." *Tyro Industries, Inc. v. James A. Wood Inc.,* 418 Pa.Superior Ct. 296, 305, 614

A.2d 279, 284 (1992), quoting *Banker v. Valley Forge Insurance Co.,* 401 Pa.Superior Ct. 367, 374, 585 A.2d 504, 508, *appeal denied,* 529 Pa. 615, 600 A.2d 532 (1991). It should be noted that neither the District nor the Commission appealed this Court's refusal to order creation of a metropolitan school district. Also, the District has legal recourse to resolve any separate issues pertaining to Commonwealth funding for desegregation expenditures. *See In re Emery,* 138 Pa.Commonwealth Ct. 668, 589 A.2d 283 (1991).

■ Even if this Court were to reach the merits of the District's joinder arguments, the result would be no different. The District asserts the additional parties are indispensable and necessary to this litigation. They are neither. An indispensable party is one whose rights are so connected with the litigated claims as to be infringed upon if any relief is granted. *Reichley v. North Penn School District,* 113 Pa.Commonwealth Ct. 528, 537 A.2d 391 (1988). Only if the merits of a case can be determined without prejudice to the rights of the absent party may the court proceed. *Mechanicsburg Area School District v. Kline,* 494 Pa. 476, 431 A.2d 953 (1988). On the other hand a necessary party is one whose presence, while not indispensable, is essential if the court is to resolve completely a controversy and to render complete relief. *York–Adams County Constables Assoc. v. Court of Common Pleas of York County,* 81 Pa.Commonwealth Ct. 566, 474 A.2d 79 (1984). The District has failed to argue or to demonstrate facts sufficient to join the additional parties on either basis.

b.

■ The District also contends it was error for this Court not to have granted its motion for a directed verdict in its entirety, that is, to have found the Commission's evidence sufficient to proceed on the issues of voluntary desegregation methods and the educational improvement component of the modified plan. In its modified plan, the District established the following educational improvement goals:

● To assure equal educational opportunities and equality of access to excellence to all students regardless of the schools they attend.

● To provide educational offerings and specialized programs designed to attract a diverse applicant pool.

● To reorganize educational offerings and to effect a measurable improvement in student performance at designated Priority I Educational Improvement schools.

● To respond to the unique educational concerns of students who will be attending racially isolated schools.

Through Mr. Anliot the Commission introduced Exhibits 10, 11, 12, 13, 13A and 14, each prepared by Mr. Anliot. Aggregately the Exhibits, when accorded the proper evidentiary weight, demonstrate that little progress, if any, has been made in desegregating Philadelphia's public school classrooms[9] through implementation of additional voluntary measures or in improving the quality of education by eliminating racial inequalities. For example, between 1983 and 1987 the modified plan resulted in a new increase of two non-segregated schools representing a

---

9. Mr. Anliot utilized three desegregation or non-segregated definitions in his statistical measurements: first, that adopted by the Commission in 1979 and mandated by this Court in 1979, see 66 Pa.Commonwealth Ct. at 180–81, 443 A.2d at 1355; second, that proposed in the Superintendent's Report of August 23, 1983; and third, that adopted by the District in 1983 as a revised definition. Under the first the definition states: "a 'non segregated' school in Philadelphia has at least 25% White enrollment and at least 40% Black enrollment; or has at least 20% Hispanic enrollment, and at least 25% White enrollment, and at least 25% Black enrollment." Exhibit 9 at p. 2. Under the second, the definition states: "A school will be considered 'desegregated' if its

White population is within a 25–60% range and its Black/Hispanic/Asian population is within 40–75%." *Id.* at p. 1 quoting "The Second Interim Report on Desegregation Planning," August 23, 1983 at p. 5. Under the third the definition states: "A school will be considered desegregated when its White enrollment is within a 25–60 percent range and its Black/Hispanic/Asian enrollment is within 40–75 percent." Exhibit 13A at p. 3 quoting "To Educate all our Children, Proposed Modifications to the Desegregation Plan of the School District of Philadelphia," October 3, 1983, revised October 23, 1983 at p. 8.

Current student enrollment data shows a 77% minority student population.

total percentage increase of 2%. *See* Exhibit 10 at p. 3. During the same time frame more than one-half of the schools in Philadelphia remained black-segregated although there was a one percent net decrease from 52% to 51%. *Id.* The number of high schools deemed black-segregated increased from 50% to 53%. *Id.* No improvement was seen between 1987 and 1990, the last year for which the Commission provided statistical data on desegregation. The total number of non-segregated senior high schools and vocational/technical high schools stayed the same; and the total number of non-segregated middle/junior high schools dropped from 15 to 8 and of non-segregated elementary schools from 42 to 40. Exhibit 13A at p. 1.[10]

At the same time that voluntary desegregation measures were falling demonstrably short, the District's attempts at educational improvement also deteriorated. Standardized test results reflected consistently lower scores for Blacks and Hispanics thereby belying any improvement in the quality of education the District purportedly afforded these youngsters. *See* Exhibits 12, 14. For example, the Commission's analysis of data for the 1986–87 school year shows that 68% of Black students and 77% of Hispanic students in grades 3, 5 and 8 were in need of remedial instruction in reading; and during the same year test results showed a need for remedial instruction in mathematics at 61% for Blacks and 66% for Hispanics in these same grades as compared to 42% and 36% respectively for white students. Exhibit 12 at p. 3. Viewing this evidence in the light most favorable to the Commission, this Court properly denied the District's motion for a directed verdict on the remaining issues before the Court.

### ATTACHMENT

#### *ORDER*

AND NOW, this 14th day of April, 1993, upon consideration of the School District's motion to join additional defendants and motion for directed verdict, Intervenor Coalition of Concerned Citizens' motion for directed verdict, and argument by counsel on April 13, 1993, the Court enters the following order:

1. The School District's motion to join as additional defendants the Commonwealth of Pennsylvania, Governor Robert P. Casey, and the Pennsylvania Department of Education is hereby denied. The School District failed to present sufficient legal basis for its argument that the Commonwealth, Governor and Department of Education are indispensable parties to this litigation, *Mechanicsburg Area School Dist. v. Kline*, 494 Pa. 476, 431 A.2d 953 (1981), or that this Court possesses the legal authority to compel the Commonwealth in these proceedings to appropriate additional resources to fund school desegregation measures which may be ordered by the Court. Also, the School District has legal recourse to resolve the separate issue of any obligations by the Commonwealth to fund district desegregation expenditures. *See In re Emery*, 138 Pa.Commonwealth Ct. 668, 589 A.2d 283 (1991).

The School District's request to join as additional defendants the school districts of Upper Darby, Interboro, Haverford, Lower Merion, Abington, Cheltenham, Colonial, Springfield, Lower Moreland, Bensalem, and Neshaminy is likewise denied. The School District's proposal for creation of a metropolitan school district was previously rejected by this Court on the basis that it lacks power and authority to compel joinder of adjacent school districts. *Pennsylvania Human Relations Commission v. School Dist. of Philadelphia*, 23 Pa.Commonwealth Ct. 312, 352 A.2d 200 (1976). It is for the Legislature of this Commonwealth to resolve this question.

2. As to the motions for directed verdict, the Human Relations Commission has failed to meet its burden to prove that mandatory busing of students would represent an appropriate or realistic measure to further desegregate Philadelphia's public schools. The Court therefore rejects the Settlement Team's proposal for mandatory busing as a means to further desegregate Philadelphia's public schools, and accordingly will no longer consider mandatory busing as an issue in this case.

---

10. This Opinion does not exhaustively examine the evidence in this regard. Rather, it cites to examples which more than satisfy denial of the District's motion in its entirety.

The motions for directed verdict are denied as to the remaining issues before the Court relating to whether the School District has failed to comply with the educational improvement component of its modified desegregation plan by eliminating racial inequalities in the provision of educational resources and opportunities within the Philadelphia public school system; and whether the School District has failed to implement additional voluntary measures to further desegregate and improve the quality of education in its public schools.

3. Pursuant to 42 Pa.C.S. § 702(b), any party to this action may seek interlocutory appellate review of this order since it involves a controlling question of law as to which there may be substantial ground for difference of opinion and from which an immediate appeal may materially advance the ultimate termination of this case. A full opinion shall be issued by the Court in the event of immediate appeal to the Supreme Court or upon ultimate resolution of the remaining issues before the Court.